UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEIL PATRICK BENNETT,

        Petitioner,

                              CASE NO. 2:11-CV-14160

v.                            JUDGE LAWRENCE P. ZATKOFF

                              MAGISTRATE JUDGE PAUL J. KOMIVES

PAUL KLEE,

        Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

| | | |
|---|---|---|
| I. | RECOMMENDATION ................................................................. | 2 |
| II. | REPORT ......................................................................... | 2 |
| | A.     *Procedural History* ................................................. | 2 |
| | B.     *Factual Background Underlying Petitioner's Conviction* ............... | 8 |
| | C.     *Procedural Default* ................................................ | 13 |
| |         1.     *Legal Standard* .............................................. | 13 |
| |         2.     *Default* ..................................................... | 14 |
| |                 a. Claims I-IV ......................................... | 14 |
| |                 b. Claims VIII-XV ...................................... | 15 |
| |                 c. Claims XVI and XVII ................................. | 16 |
| |         3.     *Exceptions* .................................................. | 17 |
| |                 a. Cause and Prejudice ................................ | 17 |
| |                 b. Actual Innocence ................................... | 20 |
| | D.     *Standard of Review* ............................................... | 21 |
| | E.     *Evidence Claims (Claims I, III-IV, XV)* ........................... | 24 |
| |         1.     *Clearly Established Law* ..................................... | 25 |
| |         2.     *Other Acts Evidence (Claims I & III-IV)* .................... | 26 |
| |                 a. Fair Trial ......................................... | 26 |
| |                 b. Ex Post Facto ...................................... | 27 |
| |         3.     *Hearsay (Claim XV)* .......................................... | 31 |
| | F.     *Prosecutorial Misconduct (Claims VIII, IX-X, XIII)* ............... | 33 |
| |         1.     *Abuse of Charging Discretion (Claim VIII)* .................. | 34 |
| |         2.     *Improper Comments (Claims IX-X)* ............................ | 38 |
| |                 a. Clearly Established Law ............................ | 38 |
| |                 b. Analysis ........................................... | 39 |
| |         3.     *Perjured Testimony (Claim XIII)* ............................ | 43 |
| |                 a. Clearly Established Law ............................ | 43 |
| |                 b. Analysis ........................................... | 45 |
| | G.     *Sufficiency of the Evidence and Right to Present a Defense (Claim XVII)* ................. | 48 |

[1]By Order entered this date, Paul Klee has been substituted in place of Ken Romanowski as the proper respondent in this action.

|  | 1. | *Notice* | 48 |
|  | 2. | *Sufficiency of the Evidence* | 50 |
| H. | | *Sentencing (Claims VI, XII)* | 51 |
|  | 1. | *Inaccurate Information (Claim VI)* | 52 |
|  |  | a. Clearly Established Law | 52 |
|  |  | b. Analysis | 52 |
|  | 2. | *Validity of Plea (Claim XII)* | 54 |
| I. | | *Ineffective Assistance of Counsel (Claims II, V, VII, XI, XIV, XVI, XVIII)* | 56 |
|  | 1. | *Clearly Established Law* | 56 |
|  | 2. | *Interlocutory Appeal (Claim II)* | 58 |
|  | 3. | *Impeachment/Cross Examination (Claims V & XI(E))* | 59 |
|  | 4. | *Failure to Investigate and Present Witnesses (Claims XI(A)-(D))* | 62 |
|  | 5. | *Failure to Challenge Jurors (Claim XIV)* | 64 |
|  | 6. | *Failure to Challenge Time Frame (Claim XVIII)* | 67 |
|  | 7. | *Appellate Counsel (Claims VII, XVI)* | 67 |
| J. | | *Recommendation Regarding Certificate of Appealability* | 68 |
|  | 1. | *Legal Standard* | 68 |
|  | 2. | *Analysis* | 70 |
| K. | | *Conclusion* | 71 |
| III. | | NOTICE TO PARTIES REGARDING OBJECTIONS | 71 |

\* \* \* \* \*

I.   <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.   <u>REPORT</u>:

A.   *Procedural History*

1.     Petitioner Neil Patrick Bennett is a state prisoner, currently confined at the Gus Harrison Correctional Facility in Adrian, Michigan.

2.     On September 5, 2006, petitioner was convicted of two counts of third degree criminal sexual conduct (CSC-III, MICH. COMP. LAWS § 750.520d, following a jury trial in the Oakland County Circuit Court. Petitioner subsequently pleaded guilty to being an habitual offender, second offense. On October 12, 2006, he was sentenced to concurrent terms of 13½-22½ years' imprisonment.[2]

---

[2]Prior to trial, the prosecutor filed a motion to admit other acts evidence pursuant to MICH. R. EVID. 404(b) and MICH. COMP. LAWS § 768.27a. After the trial court denied the prosecutor's motion,

2

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      MR. BENNETT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTION INTRODUCED AN ABUNDANCE OF IRRELEVANT AND UNDULY PREJUDICIAL OTHER BAD ACTS EVIDENCE AT HIS TRIAL, AND THE STATUTE UPON WHICH THE ADMISSION OF THIS EVIDENCE WAS BASED VIOLATES THE CONSTITUTIONAL PRINCIPLE OF SEPARATION OF POWERS.

II.     STRUCTURAL CONSTITUTIONAL ERROR OCCURRED, REQUIRING AUTOMATIC REVERSAL, WHEN TRIAL DEFENSE COUNSEL FAILED TO (1) OPPOSE THE PROSECUTOR'S INTERLOCUTORY APPEAL OF THE TRIAL COURT'S ORDER EXCLUDING OTHER BAD ACTS EVIDENCE, AND (2) APPEAL THIS COURT'S ORDER REVERSING THAT DECISION, WHICH OMISSIONS RESULTED IN THE ADMISSION OF OTHER BAD ACTS EVIDENCE AGAINST MR. BENNETT AT TRIAL.

III.    MCL 768.27A IS AN UNCONSTITUTIONAL EX POST FACTO LAW IN THAT IT PERMITTED THE STATE TO CONVICT MR. BENNETT BASED ON LESS OR DIFFERENT TESTIMONY THAN THE RULES OF EVIDENCE REQUIRED AT THE TIME OF THE ALLEGED COMMISSION OF THE OFFENSE AS MANY AS TEN YEARS EARLIER.

IV.     MR. BENNETT MUST BE RESENTENCED, WHERE HIS GUIDELINES WERE ERRONEOUSLY SCORED, AND WHERE HIS MINIMUM SENTENCE EXCEEDS HIS CORRECTLY SCORED GUIDELINES.

The court of appeals found no merit to petitioner's claims challenging his conviction, and affirmed his conviction. However, the court of appeals remanded for resentencing. *See People v. Bennett*, No. 274390, 2008 WL 942009 (Mich. Ct. App. Apr. 8, 2008) (per curiam).

4.      Petitioner was resentenced on July 3, 2008, to the same term of imprisonment that had been initially imposed. Petitioner appealed his resentencing. The court of appeals affirmed

---

the prosecutor filed an interlocutory appeal. The Michigan Court of Appeal peremptorily reversed the trial court's order, concluding that the evidence was relevant and admissible. *See People v. Bennett*, No. 272110 (Mich. Ct. App. Aug. 15, 2006).

petitioner's sentence. *See People v. Bennett*, No. 287180, 2009 WL 4981179 (Mich. Ct. App. Dec. 22, 2009).

5.      Meanwhile petitioner, through counsel, sought leave to appeal to the Michigan Supreme Court with respect to the court of appeals decision affirming his conviction.  Petitioner's application raised the following claims:

I.      THE COURT OF APPEALS ERRED IN RULING THAT MCL 768.27a PRECLUDES ANALYSIS OF THE PREJUDICIAL EFFECT OF OTHER BAD ACTS EVIDENCE UNDER MRE 404(B), AND AS A RESULT, MR. BENNETT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTION INTRODUCED AN ABUNDANCE OF IRRELEVANT AND UNDULY PREJUDICIAL EVIDENCE AT HIS TRIAL.

II.     TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO IMPEACH THE OTHER BAD ACTS WITNESS WITH INCONSISTENT STATEMENTS SHE GAVE TO POLICE.

III.    MR. BENNETT'S ENHANCED SENTENCE AS A SECOND HABITUAL OFFENDER VIOLATES DUE PROCESS, BECAUSE HE HAS NO PRIOR CONVICTION.

The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Bennett*, 483 Mich. 1070, 765 N.W.2d 879 (2009).

6.      On January 20, 2010, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.      APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT WHAT WAS CLEARLY STRONGER ISSUE(S) ON DIRECT APPEAL.

II.     THE PROSECUTOR ABUSED HER DISCRETION WHEN DEFENDANT WAS CHARGED UNDER THE WRONG STATUTE WHICH AMOUNTED TO A JURISDICTIONAL DEFECT.

A.      THE PROSECUTION ERRORED [sic] IN CHARGING DEFENDANT AS AN HABITUAL OFFENDER WHEN HIS CRIMINAL HISTORY DID NOT SUPPORT SUCH AN

4

ENHANCEMENT.

B.   PROSECUTOR ABUSED HER DISCRETION IN CHARGING DEFENDANT UNDER WRONG LAWS WHEN HE WAS CHARGED AS FORCE [sic] IN THE ALLEGED SEX CRIME BECAUSE CONSENT IS A VALID DEFENSE WHERE AS 13-16 CANNOT BE DEFENDED BY THE DEFENSE OF CONSENT.

III.   DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT WHEN THE PROSECUTION INTRODUCED A GOLDEN RULE ARGUMENT APPEALING TO THE SYMPATHY OF THE JURY.

IV.   DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT WHEN THE PROSECUTION HAD BOLSTERED THE CREDIBILITY OF THE STATE'S WITNESS.

V.   DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE HE WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.

A.   DEFENDANT WAS DENIED A FAIR TRIAL BY COUNSEL'S FAILURE TO CALL JOURDIN RODRIGUEZ AS A WITNESS.

B.   DEFENDANT WAS DENIED A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO CALL CATHERINE PLEAK AS A WITNESS.

C.   DEFENDANT WAS DENIED EFFECTIVE COUNSEL DUE TO THE FAILURE TO INVESTIGATE AND CALL AMANDA PLEAK AS A WITNESS.

D.   COUNSEL WAS INEFFECTIVE FOR THE FAILURE TO INVESTIGATE AND CALL LINDA HORNSBY AS A DEFENSE WITNESS.

E.   TRIAL COUNSEL WAS INEFFECTIVE FOR THE FAILURE TO CROSS EXAMINE MILDRED HEWLETT BECAUSE HER TESTIMONY SHE INTENDED TO GIVE MAY HAVE SWAYED THE VERDICT.

VI.   DEFENDANT'S PLEA AS AN HABITUAL OFFENDER MUST BE VACATED AND DEFENDANT RESENTENCED BECAUSE THE PLEA

WAS NOT INTELLIGENTLY, VOLUNTARILY, AND KNOWINGLY ENTERED.

VII. DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY THE KNOWING USE OF FALSE AND PERJURED TESTIMONY AND THE FAILURE TO CORRECT SUCH.

VIII. DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO CHALLENGE JURORS FOR CAUSE EFFECTIVELY DEPRIVING HIM OF A[N] IMPARTIAL JURY.

IX. THE DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL WHEN IRRELEVANT HEARSAY EVIDENCE WAS USED FOR THE TRUTH OF THE MATTER ASSERTED.

On May 27, 2010, the trial court denied petitioner's motion for relief from judgment, concluding that petitioner failed to establish either good cause or actual prejudice, as required for consideration of his claims on the merits. In making this determination, the trial court found that each of petitioner's claims was without merit. *See People v. Bennett*, No. 06-206697-FH (Oakland County, Mich., Cir. Ct. May 27, 2010) [hereinafter "Trial Ct. op. I"]. The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders. *See People v. Bennett*, 490 Mich. 857, 802 N.W.2d 346 (2011); *People v. Bennett*, No. 299164 (Mich. Ct. App. Dec. 2, 2010).

7. While petitioner's motion for relief from judgment was pending in the trial court, petitioner filed an application for the writ of habeas corpus in this Court. Petitioner also requested that the Court stay the petition so that he could complete the exhaustion of his state court remedies. On June 2, 2010, Judge Anna Diggs Taylor denied petitioner's request for a stay and dismissed the petition without prejudice. *See Bennett v. Wolfenbarger*, No. 2:10-CV-11054 (E.D. Mich. June 2, 2010).

6

8.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on September 22, 2011.  As grounds for the writ of habeas corpus, he raised the 20 claims that he had to that point raised in the state courts on direct appeal and postconviction review.  The Court subsequently granted petitioner's motion to stay the case so that he could exhaust further claims.

9.     On March 2, 2012, petitioner filed a second motion for relief from judgment in the trial court, raising the following claims:

I.     APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT WHAT WAS CLEARLY STRONGER ISSUE(S) ON DIRECT APPEAL.

II.    DEFENDANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND FAIR TRIAL WERE VIOLATED WHEN INSUFFICIENT EVIDENCE WAS USED TO PROCURE HIS CONVICTION OF THIRD DEGREE C.S.C., BECAUSE THE SIX YEAR TIME SPAN WHERE THE COMPLAINANT COULD NOT RECALL A SINGLE DATE DEPRIVED DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE.

III.   DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE WHEN HIS COUNSEL FAILED TO OBJECT TO THE PEOPLE'S USE OF INSUFFICIENTLY VAGUE 6 YEAR TIME FRAME EVIDENCE TO PROCURE HIS CONVICTION OF THIRD DEGREE C.S.C.

On May 14, 2012, the trial court denied the motion, concluding that it was a prohibited successive motion barred by MICH. CT. R. 6.502(G).  *See People v. Bennett*, No. 06-206697-FH (Oakland County, Mich., Cir. Ct. May 14, 2012) [hereinafter "Trial Ct. op. II"].  The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on Rule 6.502(G).  *See People v. Bennett*, 493 Mich. 921, 823 N.W.2d 567 (2012); *People v. Bennett*, No. 311706 (Mich. Ct. App. Oct. 23, 2012).

10.    Petitioner sought to reopen the case and filed an amended petition on January 7,

2013.  On February 5, 2013, the Court granted petitioner's request to reopen the case and deemed

petitioner's amended application filed.  Petitioner's amended application raises 18 of the claims that

he raised at various times in the state courts.  Specifically, he raises: the first three claims raised in

the Michigan Court of Appeals on direct appeal; the three claims raised in the Michigan Supreme

Court on direct appeal; the nine claims raised in his first motion for relief from judgment; and the

three claims raised in his second motion for relief from judgment

      11.     Respondent filed his answer on August 5, 2013.  He contends that petitioner's first

through fourth, and eighth through seventeenth claims are barred by petitioner's procedural default

in the state courts.  He also contends that both petitioner's defaulted claims and his non-defaulted

claims are without merit.

      12.     Petitioner filed a reply to respondent's answer on November 7, 2013.

B.    *Factual Background Underlying Petitioner's Conviction*

      Petitioner's conviction arises from the repeated sexual assault of his former girlfriend's

daughter from June 1996 through June 2001.  The evidence adduced at trial was briefly summarized

by the Michigan Court of Appeals:

> At trial, the prosecutor presented evidence that defendant's sexual conduct continued
> after he moved out of the home that defendant shared with the victim and his former
> girlfriend, including one instance of penile penetration that allegedly occurred when
> the victim was 13 years old and visiting the defendant at his mother's house.  The
> victim testified that she told her mother about the sexual abuse during a conversation
> about another female minor.  The other minor was permitted to testify at trial,
> pursuant to MCL 768.27a, about two occasions in which defendant fondled her.  She
> testified that defendant fondled her breasts in 1999, while they were inside a camper
> located in the backyard of the victim's home.  She further testified that in 2002, after
> defendant developed a boyfriend-girlfriend relationship with her mother and moved
> into her home, defendant groped her breasts and crotch area after she accompanied
> him into a friend's home.

*Bennett*, 2008 WL 942009, at *1.  The evidence was more fully summarized in the prosecutor's

response to petitioner's second motion for relief from judgment in the trial court, as quoted in

respondent's answer:

> The People called BB as their first witness. BB testified that she was born on April 10, 1990, and that she was 16 years-old at the time of trial. BB's mother's name is Louinda [Some witnesses in the trial in this case called Louinda Gee by the name Linda Gee.] Gee. BB met Defendant when she was 5 or 6 years-old and he began dating her mother. (T-II, 14-15). BB's older brother also lived with them. They lived at 2820 Newberry in Waterford Township. Defendant would take BB riding on his dirt bike, would buy her things and took her places with him. (T-II, 16). Defendant went to BB's teacher conferences and school plays. He was in charge of BB when her mother was not home. Defendant called BB "Baby Girl" and "Jelly Bean" and introduced her as his daughter. (T-II, 17-18).
>
> When she was young, BB made a fort one evening in her room out of sheets. The Defendant came into her room, undid her pants and put his fingers into her vagina. BB's mother came home and was beating on the doors because they were locked. (T-II, 20-24). BB did not say anything to her mom because she was scared. The Defendant would drink and beat her mother and she was scared that he would do that to her too. (T-II, 25).
>
> BB testified further that another night when she was between 5 and 11 years-old, the Defendant came into her bedroom while she was sleeping. He grabbed her and put her on her back on the floor. He pulled her underwear down to her ankles and licked her vagina. Defendant then flipped her over onto her stomach and licked the crack of her butt. He flipped her back over again and penetrated her with his penis, which hurt. After Defendant stopped, he left BB on the floor with her underwear down at her ankles. BB got back in bed and went to sleep. She did not say anything to anyone because she was scared Defendant would hurt her or her mom. (T-II, 26-30). Defendant put his penis inside her on more than one occasion. (T-II, 31).
>
> On another occasion, she and Defendant were laying on a couch in the living room of their house watching her brother play video games. BB and Defendant had a blanket over them. Defendant put his toes under her underwear and touched her vagina with his toes. (T-II, 32-33).
>
> BB testified further that when she was 13 years old, she and her friend Jordan Rodriguez were at Defendant's mother's house. Defendant had broken up with BB's mother and was not living in their house. Defendant gave BB beer and cigarettes. (T-II, 35-38). Jordan started to pass out and B[B] tried to keep her awake because she was afraid Defendant would molest her again. (T-II, 36-37). Defendant said he missed BB and tried to French kiss her, but she ran away. She could not find a phone. (T-II, 38).
>
> Jordan fell asleep and BB was feeling drunk. Defendant grabbed BB's feet and dragged her to the floor. He pulled her pants down and licked her vagina. Defendant then pulled his penis out of his jeans and penetrated her vagina with his

9

penis. BB could not move because Defendant was over the top of her. Defendant took her home the next morning. (T-II, 39-41). BB did not tell her mom what had happened because she did not want her mother, an alcoholic, to think bad of her. She was also scared that Defendant would hurt her. BB did tell Jordan what Defendant had done to her. (T-II, 42-43). BB went over to Defendant's mother's house because he had been like a dad to her and she missed him as a father figure. Her real dad had passed away. Defendant would argue with BB's brother, but was always real nice to her and would get her things. BB testified that she loved Defendant. (T-II, 47-50).

BB testified further that after a conversation with her mother about a former girlfriend of Defendant named Tanna and Tanna's daughter KS, BB told her mother what Defendant had done to her. BB then talked to the police and was interviewed at Care House on April 19, 2005. (T-II, 45-47).

Ms. Louinda Gee testified that she had a son and a daughter. Her son William was presently 20 years old and her daughter BB was 16 years old. (T-II, 61). Ms. Gee met Defendant in a bar in 1996 and a boyfriend/girlfriend relationship developed between them. After about six months of dating, Defendant moved into her house on Newberry in Waterford. Her son and daughter also lived in the house. (T-Il, 62-63). Defendant moved out of the house on June 19, 2001. In the time that he lived in the home, Defendant was responsible for watching and disciplining the children if Ms. Gee was not home. Defendant was to be a father figure, but was not to discipline the children in any physical manner. (T-II, 64-65). Defendant went to BB's school conferences, Christmas concerts and other school activities. (T-II, 66). Ms. Gee was employed full-time and Defendant was employed off and on at different jobs while he lived in her house. (T-II, 66-67). There were times when BB and Defendant were in the house alone. (T-II,67-68).

Ms. Gee testified further that on one evening she came home from a Weight Watchers meeting and all the doors were locked, which was unusual. She kept banging on the doors until either Defendant or BB let her into the house. Ms. Gee wondered why it took so long for them to let her in. She talked to BB about it and was not sure if something unusual was going on. (T-II, 68-70). After Defendant moved out of her house, Ms. Gee had a conversation with BB in which BB said that Defendant had molested her. Ms. Gee contacted the Waterford police as well as Defendant's new girlfriend, who had children. (T-II, 71-73).

Ms. Gee testified that after she contacted Defendant's new girlfriend, Defendant called her at work on her cell phone. Defendant told Ms. Gee that everything BB said was true and that he had molested BB. Defendant said that he left Ms. Gee because he could not stand the guilt anymore. Defendant told her he would do whatever it took for Ms. Gee and BB to be able to heal. (T-II, 74-75). When Ms. Gee asked Defendant if he had penetrated BB, Defendant said that "he didn't remember doing that". (T-II, 76-77). On a later date, Defendant left Ms. Gee a recorded phone message in which he kept saying that he was sorry. (T-II, 78-79). Ms. Gee subsequently took BB to Care House where she was interviewed outside the presence of Ms. Gee. (T-II, 79-80).

When Defendant lived with Ms. Gee, he would beat her in BB's presence

10

every two or three months. (T-II, 81-82). Defendant always called BB "Baby Girl" or "Jelly Bean" and would introduce her to others as his daughter. (T-II, 83).

Mr. Dewain Thornberry testified that he had been ordained as a minister online and had started a church called the Spiritual Life Church. He knew both Defendant and Ms. Gee through his association with Alcoholics Anonymous. Defendant was a member of Mr. Thornberry's church. (T-II, 96-99). In March of 2005, Defendant was in a relationship with a woman named Katherine Pleak or Altomare. Ms. Pleak had called Mr. Thornberry and said she had received information from Ms. Gee and BB. Ms. Pleak wanted Mr. Thornberry present when she confronted Defendant with the information. Mr. Thornberry was present when Ms. Pleak confronted Defendant. Defendant said that he was "a bastard" and that he had done what Ms. Gee said he had done. (T-II, 100-105). Defendant looked sad and forlorn and said that he was prepared to do anything to make things right. (T-II, 106). Mr. Thornberry in the past had pleaded guilty to second degree criminal sexual conduct for touching his stepdaughter. (T-II, 104; II 10).

Ms. Katherine Pleak testified that she met Defendant in June of 2003 and was in a boyfriend/girlfriend relationship with him in July of 2003. She would go to AA functions with him at the Alano Club. In August, 2003, Defendant came and stayed at her house. Ms. Pleak had a daughter who was currently 19 years old. Defendant had lived in Ms. Pleak's house since July, 2004. (T-II, 113- I IS). He introduced Ms. Pleak to Louinda Gee in the parking lot of the Alano Club in September, 2003. Ms. Pleak and Ms. Gee became friends. (T-II, 115-116).

Ms. Pleak also knew Mr. Thornberry and went to his church at times. (T-II, 116-117). Around March of 2003, Ms. Gee called Ms. Pleak and told her something regarding BB and Defendant. Ms. Pleak called Dewain Thornberry and told him what Ms. Gee had told her. (T-II, 117-118). Mr. Thornberry came over to Ms. Pleak's house the next day when she told Defendant what Ms. Gee had related to her. Defendant said that he did not molest BB. (T-II, 121-124). Defendant called Ms. Gee on his cell phone and asked her what was going on with these allegations. Ms. Pleak did not hear Defendant say to Ms. Gee that what BB said was true, that he did molest her. (T-II, 124-126). Ms. Pleak testified that she still lived with Defendant and loved him. (T-II, 127-128).

Detective Giovanni Palombo of the Waterford Township Police Department testified that he was the officer in charge of this case. Louinda Gee called him in April of 2005 and told him that there was a problem in her relationship with Defendant and that something had happened to her daughter. (T-II, 134-136). Det. Palombo initiated an investigation and arranged for BB to be interviewed at Care House by a female forensic interviewer. Det. Palombo observed the interview of BB through a one-way glass at Care House on April 19, 2005. (T-II, 136-139).

Subsequent to the interview of BB, Det. Palombo obtained information concerning another victim and interviewed KS and her mother Valarie Schultze. Det. Palombo also interviewed Dewain Thornberry who was fully cooperative with him. (T-II, 142-145). Det. Palombo tried telephoning Defendant, but never made contact with him. (T-II, 143-144).

11

KS testified that she was born on August 17, 1985, and that she was 21 years old at the time of trial. KS first met Defendant in the backyard of the house where her friend Brianne Huffman [Brianne Huffman is not the same person as BB, the victim in this case. (T-II, 154).] lived. KS testified that she was outside with Brianne when they were not supposed to be outside so Brianne's grandfather told KS to go home. Defendant told KS that she could go back to his house. (T-II, 157). Defendant was living with Linda Gee at that time, which was "pretty much in the backyard" of Brianne Huffman's house. (T-II, 157). Rather than going home, Defendant and KS got in a camper parked in Linda Gee's backyard. Inside the camper, Defendant laid down next to KS and started groping her breasts and kissing her with his tongue. KS told Defendant that she wanted to go home, left the camper and walked home. She was probably 14 years old at that time. (T-II, 156-158).

Defendant subsequently met KS's mother at the Alano Club, began a relationship with KS's mother and moved into their house. Defendant lived with KS, her mother, her sister and brother from 2000 to 2003. (T-I, 155-156). During the summer of 2002, KS and Defendant went to hang out over at the house of the Salases, friends of Defendant. KS sat outside while Defendant drank a little bit and then the two of them went downstairs inside the house. KS was sitting on a couch and Defendant knelt down between her legs. Defendant groped KS's breasts and crotch and kissed her neck with his tongue. KS told him that she was uncomfortable and wanted to go home. KS did not know why she did not tell anyone about the incidents in 1999 and 2002 at those times. (T-II, 159-161).

KS testified that she met the victim, BB (not Brianne Huffman) for the first time that day in the hallway of the courthouse. (T-II, 162). Following the testimony of KS, the People rested. (T-II, 165).

Defendant called Mildred Hewlett as a defense witness. Ms. Hewlett testified that she is Defendant's mother. She knew BB and BB had never been at Ms. Hewlett's house without her mother. (T-II, 166-167). Ms. Hewlett did not know what took place at Louinda Gee's house. (T-II, 171).

Arturo Salas, Jr., was called as a defense witness. Mr. Salas testified that he lived in a house on Nokomis Way in Waterford. Defendant and KS came over to his home one evening in 2003. Mr. Salas was able to see what was going on between Defendant and KS and he never saw Defendant fondle KS. (T-II, 173). Mr. Salas could not recall if Defendant gave any beer to KS. Defendant was drinking, but did not appear to be intoxicated. (T-II, 178). Mr. Salas could not say that he knew where Defendant was every minute in his house that evening. (T-II, 179). Following the testimony of Mr. Salas, Defendant rested. (T-II, 180). The People presented no rebuttal evidence.

See Answer, at 9-15 (footnotes omitted) (quoting People's Answer in Opp'n to Def.'s Mot. for

Relief from Judgment, dated 4/26/10, in *People v. Bennett*, No. 06-206697-FH (Oakland County,

Mich., Cir. Ct.), at 2-8); *see also*, Def.-Appellant's Br. on Appeal, in *People v. Bennett*, No. 274390

(Mich. Ct. App.), at 1-6.

C.      *Procedural Default*

Respondent contends that the bulk of petitioner's habeas claims are barred by petitioner's procedural default in the state courts, for various reasons.  The Court should agree.

1.      *Legal Standard*

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263.  Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").  If a claim is procedurally defaulted, a habeas court may not review the claim unless the petitioner establishes cause for, and prejudice attributable to, the default, or that failure to consider the claim will result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.

2.      *Default*

a.  *Claims I-IV*

13

Respondent argues that petitioner's first four claims are procedurally defaulted because petitioner did not properly exhaust them. The Court should agree. The federal habeas statute provides, in relevant part, that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" 28 U.S.C. § 2254(b)(1)(A). Thus, "[f]ederal habeas relief is available to state prisoners only after they have exhausted their claims in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999). To satisfy the exhaustion requirement, a petitioner "must have 'fairly presented the substance of each of his federal constitutional claims to the state courts.'" *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (quoting *Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995)). Further, the petitioner must fairly present the claim at each level of state court review. *See O'Sullivan*, 526 U.S. at 845-47. Here, petitioner's first three claims were never presented to the Michigan Supreme Court, and thus are not properly exhausted. Although petitioner's fourth claim was presented to the Michigan Supreme Court, it was not first presented to the Michigan Court of Appeals. Because these four claims were not presented at each level of the state court system, they were not properly exhausted. *See O'Sullivan*, 526 U.S. at 845-47.

In *Coleman v. Thompson*, *supra*, the Supreme Court suggested in dicta that where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims." *Coleman*, 501 U.S. at 735 n.*. Although the *Coleman* footnote was dicta, it has subsequently been applied by both the Supreme Court and the Sixth Circuit. *See O'Sullivan*, 526 U.S. at 848; *Gray v. Netherland*, 518

14

U.S. 152, 162 (1996); *Hannah v. Conley*, 49 F.3d 1193, 1195-96 (6th Cir. 1995) (per curiam). Where no further avenues to present a claim exist, the claim is deemed technically exhausted, and the question becomes solely whether the claim is barred by a procedural default.  *See Broom v. Mitchell*, 441 F.3d 392, 399-400 (6th Cir. 2006).  Because petitioner has already filed a motion for relief from judgment challenging his convictions, he may not bring a second motion raising the unexhausted claims.  The Michigan Court Rules explicitly provide that "one and only one motion for relief from judgment may be filed with regard to a conviction."  MICH. CT. R. 6.502(G)(1).  Thus, there is no further state court avenues of relief available for petitioner to pursue his claims.  His claims are therefore technically exhausted, but defaulted.

### b. Claims VIII-XV

Petitioner's Claims VIII-XV were raised for the first time in his first motion for relief from judgment in the trial court.  Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief."  MICH. CT. R. 6.508(D).  The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not, unless the defendant establishes good cause and actual prejudice.  *See* MICH. CT. R. 6.508(D)(1)-(3).  Both the Michigan Court of Appeals and the Michigan Supreme Court rejected petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  The Sixth Circuit has held that the form orders used by the Michigan courts constitute unexplained orders which are ambiguous as to whether a procedural bar is being invoked,

and thus a federal habeas court must "look through" these orders to the last reasoned state court judgment to determine if the claims are barred. *See Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc). Here, the trial court clearly invoked Rule 6.508(D)(3) in rejecting petitioner's claims. The court quoted the rule, headed its analysis section "The Defendant has failed to establish 'good cause' or actual prejudice,' and after analyzing petitioner's claims concluded that petitioner "failed to demonstrate the requisite good cause for not raising the various issues on direct appeal; he also has failed to demonstrate actual prejudice. MCR 6.508(D)(3)." *See* Trial Ct. op. I, at 2-3, 4, 17. Thus, the trial court clearly and expressly relied on the procedural bar set forth in Rule 6.508(D)(3) in rejecting petitioner's claim. There is no question that Rule 6.508(D)(3) was firmly established and regularly followed at the time of petitioner's default. Thus, petitioner's eighth through fifteenth claims are procedurally defaulted.

### c. Claims XVI and XVII

Finally, respondent argues that petitioner's sixteenth and seventeenth claims are barred because petitioner first presented them in a successive motion for relief from judgment prohibited by Michigan law. Again the Court should agree. These claims were first presented in petitioner's second motion for relief from judgment. The Michigan Supreme Court clearly and expressly relied on a procedural bar in denying review of petitioner's claims, denying leave to appeal because "the defendant's motion for relief from judgment is prohibited by MCR 6.502(G)." *Bennett*, 493 Mich. at 921, 823 N.W.2d at 567.[3] Rule 6.502(G) prohibits a second or successive motion attacking a conviction that was the subject of a prior motion for relief from judgment. The Michigan Supreme Court's order reflects a clear and express invocation of this procedural bar. *See Stewart v.*

---

[3]The trial court and Michigan Court of Appeals both likewise expressly invoked Rule 6.502(G) in denying petitioner's claims.

*McQuiggin*, No. 2:10-CV-13365, 2013 WL 593465, at *8 (E.D. Mich. Feb. 15, 2013) (Edmunds, J.).  Accordingly, these claims are likewise defaulted.

3.    *Exceptions*

*a.  Cause and Prejudice*

Because each of the claims discussed above is procedurally defaulted, review of these claims is barred unless petitioner is able to meet one of the two exceptions to the procedural default rule. The first exception requires petitioner to demonstrate cause for, and prejudice attributable to, his default.  *See Coleman*, 501 U.S. at 750; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003).  The Court should conclude that he cannot show cause for his procedural default.

To establish "cause," petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray*, 477 U.S. at 488; *see also*, *Coleman*, 501 U.S. at 753.  Petitioner contends that appellate counsel was ineffective for failing to raise these claims on his direct appeal.  As the Supreme Court has observed, "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to establish cause.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  In order to constitute cause, however, counsel's performance must amount to ineffective assistance of counsel under the Sixth Amendment.  *See id.*  Here, ineffective assistance of appellate counsel cannot constitute cause to excuse petitioner's default of his first three claims, because the default with respect to these claims was petitioner's failure to raise them in his appeal to the Michigan Supreme Court.  Any failure of counsel in connection with petitioner's appeal to the Michigan Supreme Court cannot amount to a violation of the Sixth Amendment, and thus cannot constitute cause to excuse petitioner's procedural default, because at that point petitioner had no constitutional

17

right to counsel.  Under Michigan law, a defendant may seek an appeal in the Michigan Supreme Court; however, such an appeal is discretionary.  *See* MICH. CT. R. 7.302.  A defendant has no constitutional right to counsel in pursuing such a discretionary appeal, and thus counsel's ineffectiveness in pursuing petitioner's discretionary appeal cannot constitute cause to excuse his procedural default.  *See Coleman*, 501 U.S. at 752; *Ritchie v. Eberhart*, 11 F.3d 587, 591-92 (6th Cir. 1993); *Gentry v. Trippett*, 956 F. Supp. 1320, 1326 (E.D. Mich. 1997).  Likewise, petitioner cannot establish cause based on counsel's ineffective assistance with respect to the three claims raised in his second motion for relief from judgment.  The default with respect to these claims occurred as a result of petitioner's failure to include these claims in his first motion for relief from judgment.  As with a discretionary appeal, petitioner had no right to counsel in connection with his first motion for relief from judgment, and thus petitioner cannot establish cause with respect to these claims.  *See Coleman*, 501 U.S. at 752.

With respect to the claims raised in petitioner's first motion for relief from judgment, petitioner cannot establish that counsel was ineffective.  It is well established that "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).  Although it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent."  *Id*.  As a general rule, it is "'only when ignored issues are clearly stronger than those presented [that] the presumption of effective assistance of counsel [can] be overcome.'"  *Id*. (quoting  *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  Further, in the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability

18

that his claims would have succeeded on appeal.  *See id*. at 285-86; *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).

Here, petitioner cannot show that appellate counsel was ineffective for failing to raise these issues on direct appeal.  Counsel raised significant issues on direct appeal.  Although these claims were ultimately unsuccessful, they were not without legal and factual support.  Petitioner has not shown that the claims raised in his motion for relief from judgment were "clearly stronger than those presented" on direct appeal so as to show that counsel was incompetent.  *Smith*, 528 U.S. at 288. Further, as explained in the remainder of this Report, each of petitioner's claims is without merit, and thus petitioner cannot show that he was prejudiced by counsel's failure to raise these claims on direct appeal.

Because petitioner must establish both cause and prejudice, his failure to establish cause makes it unnecessary to consider the prejudice issue.  *See Hargrave-Thomas v. Yukins*, 374 F.3d 383, 389 (6th Cir. 2004); *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004).  Nevertheless, as noted below even if petitioner could establish cause, he cannot establish prejudice because his claims are without merit.  *See Nunn v. Yukins*, No. 98-2309, 2000 WL 145378, at *1 (6th Cir. Feb. 4, 2000) (no prejudice where defaulted claims were meritless); *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994) (same); *Alvarez v. Straub*, 64 F. Supp. 2d 686, 696 (E.D. Mich. 1999) (Rosen, J., adopting Report & Recommendation of Komives, M.J.) (same).

### b.  Actual Innocence

Under the second exception, known as the "fundamental miscarriage of justice" exception, petitioner can still have his procedurally barred claims reviewed if he can show that the constitutional errors he alleges "'ha[ve] probably resulted in the conviction of one who is actually

innocent.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Murray*, 477 U.S. at 496); *accord Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). In order to be entitled to the actual innocence exception, however, a petitioner must present "new and reliable evidence that was not presented at trial" that "show[s] that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 299 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327 (internal citation and quotation omitted); *see also*, *Bousley*, 523 U.S. at 623. It is not sufficient to show merely that the evidence raises a reasonable doubt which did not otherwise exist. *See Schlup*, 513 U.S. at 329 ("The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."). "Examples of evidence which may establish factual innocence include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence"). *See generally*, *Souter*, 395 F.3d at 589-90. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Thus, to establish the actual innocence exception "petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). In short, "the *Schlup* standard is demanding," *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1936 (2013), with the result that "tenable actual-innocence gateway pleas are rare." *Id*. at 1928.

20

Here, petitioner has pointed to no new, reliable evidence of the type identified in *Schlup* that

shows he is actually innocent.  Although petitioner did purport to base his second motion for relief

from judgment on newly discovered evidence, as the trial court explained this evidence consisted

only of statements in the record from the preliminary examination and trial, and petitioner's own

affidavit, none of which constitute new evidence.  Accordingly, the Court should conclude that

failure to consider petitioner's claims on the merits will not result in a fundamental miscarriage of

justice.

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of

whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).  The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

23

Although the bulk of petitioner's claims are procedurally defaulted, the deferential standard of review set forth in § 2254(d) is applicable to an analysis of the claims on the merits. With respect to the claims petitioner failed to raise in the Michigan Supreme Court on direct appeal, the Michigan Court of Appeals adjudicated the claims on the merits. With respect to the claims raised in petitioner's motions for relief from judgment, the trial court considered and rejected the merits of each claim, either in the alternative or as part of its analysis of actual prejudice. Where a state court addresses the merits as an alternative ground for decision notwithstanding its application of a procedural bar, the alternative merits adjudication is considered "on the merits" for purposes of § 2254(d) and is entitled to deference under the AEDPA. *See Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008); *see also*, *Rolan v. Coleman*, 680 F.3d 311, 319-20 (3d Cir. 2012) (citing cases). Similarly, where a state court considers and decides the merits of a claim as part of its procedural default analysis, AEDPA deference applies. *See Jermyn v. Horn*, 266 F.3d 257, 279 n.8 (3d Cir. 2001). Accordingly, the AEDPA standard of review is applicable to petitioner's claims.

E.      *Evidence Claims (Claims I, III-IV, XV)*

Petitioner first raises several claims challenging the admission of certain evidence at his trial. In Claims I, III, and IV, he challenges on various grounds the introduction of other acts evidence. In Claim XV, he challenges the introduction of hearsay evidence. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court

24

determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2.    *Other Acts Evidence (Claims I & III-IV)*

Petitioner raises several claims challenging the introduction of other acts evidence at his trial.

25

This evidence was admitted pursuant to MICH. COMP. LAWS § 768.27a, which allows introduction of evidence in a child sexual assault case of previous instances of child sexual assault committed by the defendant without the need to satisfy the requirements of Rule 404(b). *See* MICH. COMP. LAWS § 768.27a. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

### a. Fair Trial

Petitioner first contends in (Claims I and IV) that he was denied a fair trial by the introduction of other acts evidence, and by the trial court's failure to balance the probative value of this evidence against its prejudicial effect under Rule 403. This claim is without merit. As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001). In short, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence," *Bugh*, 329 F.3d at 512, and thus petitioner is not entitled to habeas relief on this claim. Moreover, § 768.27a is not unique; federal law likewise explicitly allows such evidence. *See* FED. R. EVID. 414. The courts have repeatedly rejected due process challenges to these and similar laws from other jurisdictions, *see, e.g.*, *United States v. Coutentos*, 651 F.3d 809, 819 (8th Cir. 2011); *United States v. LeMay*, 260 F.3d 1018, 1024-27 (9th Cir. 2001); *Ray v. Kernan*, 646 F. Supp. 2d 1102, 1123 (N.D. Cal. 2009), further supporting the conclusion that the Michigan Court of Appeals's rejection of

petitioner's claim was reasonable.

### b. Ex Post Facto

Petitioner also contends that § 768.27a constitutes an unconstitutional ex post facto law as applied to him. The Michigan Court of Appeals, relying on its prior decision in *People v. Pattison*, 276 Mich. App. 613, 741 N.W.2d 558 (2007), rejected this claim. *See Bennett*, 2008 WL 942009, at *2. This determination was reasonable.

Article 1, § 10 of the United States Constitution prohibits states from passing *ex post facto* laws. In *Collins v. Youngblood*, 497 U.S. 37 (1990), the Supreme Court explained that the Ex Post Facto Clause of the U.S. Constitution incorporated "a term of art with an established meaning at the time of the framing of the Constitution." *Id.* at 41. In connection with this interpretation, the Court held that the Clause targets laws that "retroactively alter the definition of crimes or increase the punishment for the criminal act." *Collins*, 497 U.S. at 43 (*citing to Calder v. Bull*, 3 U.S. (Dall.) 386, 391-392 (1798)(Chase, J.); *Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925)). To fall within the *ex post facto* prohibition, a law must be retrospective, *i.e.*; "it must apply to events occurring before its enactment" and it "must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29 (1981). The classic formulation of what constitutes an ex post facto law was set forth by Justice Chase in *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798):

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at 390. Thus, an ex post facto law is one which: (1) punishes an act previously committed as

27

a crime, although the act was not a crime when done; (2) increases the penalty for a crime after its

commission; and (3) deprives a defendant of any defense which was available at the time the act was

committed. *See Collins*, 497 U.S. at 52.

Generally, the admission in a criminal trial of evidence of a defendant's acts other than those

with which he is charged is governed by Rule 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the
> character of a person in order to show action in conformity therewith. It may,
> however, be admissible for other purposes, such as proof of motive, intent,
> preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence
> of mistake or accident when the same is material, whether such other crimes, wrongs,
> or acts are contemporaneous with, or prior or subsequent to the conduct at issue in
> the case.

MICH. R. EVID. 404(b)(1).  In 2005, after the conduct at issue in this case occurred, the Michigan

legislature enacted § 768.27a, which became effective on January 1, 2006, as a supplement to Rule

404(b) in cases involving sexual offenses with minors. Section 768.27a provides, in relevant part,

that "in a criminal case in which the defendant is accused of committing a listed offense against a

minor, evidence that the defendant committed another listed offense against a minor is admissible

and may be considered for its bearing on any matter to which it is relevant."  MICH. COMP. LAWS

§ 768.27a(1).[4]  Petitioner, citing to the fourth ex post facto formulation in *Calder*, contends that §

768.27a "alters the legal rules of evidence" and thus its application in his case violated the Ex Post

Facto Clause.

---

[4]A "listed offense" under § 768.27a(1) "means that term as defined in section 2 of the sex
offenders registration act, 1994 PA 295, MCL 28.722."  MICH. COMP. LAWS § 768.27a(2).  Section 2 of
the Sex Offenders Registration Act, in turn, defines "listed offense" to include, as relevant
here, violations of § 750.145c(4), *see* MICH. COMP. LAWS § 28.722(s)(*l*); violations of § 750.145c(2), *see* MICH.
COMP. LAWS § 28.722(u)(*iii*); and violations of § 750.520c with a victim under the age of 13, *see* MICH.
COMP. LAWS § 28.722(w)(*r*).

In *Pattison*, upon which the court relied in petitioner's case, the court reasoned that although the statute may allow introduction of evidence that previously would have been inadmissible under Rule 404(b), "the altered [admissibility] standard does not lower the quantum of proof or value of the evidence needed to convict a defendant." *Pattison*, 276 Mich. App. at 619, 741 N.W.2d at 561-62. For example, the court explained, the defendant could be convicted solely on the basis of the victim's testimony, regardless of any evidence admitted under the statute. Thus, the statute did not alter the standard for conviction, and therefore did not violate the ex post facto prohibition. *See id.*, 741 N.W.2d at 562. This conclusion was correct. In *Carmell v. Texas*, 529 U.S. 513 (2000), the Supreme Court considered a Texas rule which abolished the requirement of corroboration of a victim's testimony before a defendant could be convicted of sexual assault. *See id.* at 516. The Court held that retroactive application of this rule was an ex post facto law because it "changed the quantum of evidence necessary to sustain a conviction." *Id.* at 530. The court noted that the rule did not simply regulate the mode by which evidence is presented to the jury, but rather the sufficiency of the prosecutor meeting the burden of proof. *See id.* at 545. The Court was careful to note, however, that ordinarily rules of evidence do not constitute an ex post facto law under the fourth *Calder* formulation. The court explained that such rules do not "necessarily affect, let alone subvert, the presumption of innocence. The issue of the admission of evidence is simply different from the question whether the properly admitted evidence is sufficient to convict the defendant." *Id.* at 546. As the Court explained:

> We do not mean to say that every rule that has an effect on whether a defendant can be convicted implicates the Ex Post Facto Clause. Ordinary rules of evidence, for example, do not violate the Clause. Rules of that nature are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case. More crucially, such rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do

> not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as "unfair" or "unjust," they do not implicate the same kind of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard.

*Id*. at 533 n.23.

Here, the rule implemented by § 768.27a is a procedural rule governing the admissibility of evidence; it does not, as in *Carmell*, in any way change the prosecutor's burden of proof or the sufficiency of the evidence necessary to meet that burden. Thus, the court of appeals was correct in finding no ex post facto problem in the application of § 768.27a. *See Hensley v. Lafler*, No. 1:09-CV-937, 2012 WL 5205808, at *15-*16 (Sept. 26, 2012), *magistrate judge's report adopted*, 2012 WL 5205804 (W.D. Mich. Oct. 22, 2012); *Lucas v. Rivard*, No. 2:10-CV-14948, 2012 WL 5990221, at *7-*9 (May 11, 2012) (Komives, M.J.), *magistrate judge's report adopted*, 2012 WL 5989857 (E.D. Mich. Nov. 30, 2012) (Hood, J.); *see also, Schroeder v. Tilton*, 493 F.3d 1083, 1088 (9th Cir. 2007) (California statute permitting introduction of evidence of prior uncharged sexual misconduct did not alter the quantum of proof necessary to sustain conviction, and thus did not constitute an ex post facto law); *State v. Willis*, 915 So. 2d 365, 382 (La. Ct. App. 2005) (same with respect to similar Louisiana law); *State v. Scherner*, 225 P.3d 248, 255-56 (Wash. Ct. App. 2009) (same with respect to similar Washington law), *rev'd in part on other grounds sub nom. State v. Gresham*, 269 P.3d 207 (Wash. 2012); *cf. Trotter v. Secretary, Dep't of Corrections*, 535 F.3d 1286, 1292-93 (11th Cir. 2008) (retroactive application of new law permitting introduction of victim impact evidence at penalty phase in capital case did not violate Ex Post Facto Clause because the new law did not alter the quantum of evidence necessary to impose death penalty); *Neill v. Gibson*, 278 F.3d 1044, 1051-53 (10th Cir. 2001) (same); *People v. Dolph-Hostetter*, 256 Mich. App. 587, 594-600, 664 N.W.2d 254, 258-61 (2003) (retroactive application of change in Michigan marital communications privilege

30

did not constitute ex post facto law under *Carmell*).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

    3.    *Hearsay (Claim XV)*

Petitioner next claims that he was denied a fair trial by the introduction of Gee's testimony that petitioner admitted to sexually assaulting her daughter, as well as Thornberry's similar testimony.  Petitioner contends that because these witnesses lacked "particularized guarantees of trustworthiness," the introduction of the his hearsay statements through these witnesses violated his constitutional rights.  The trial court rejected this claim, concluding that "because the statements at issue are statements that the *Defendant made* . . . they constitute admissions by a party opponent which are admissible under MRE 801(d)(2)."  Trial Ct. op. I, at 17.  This determination was reasonable.  Rule 801(d)(2) provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is the party's own statement[.]" MICH. R. EVID. 801(d)(2)(A).  Because the witnesses testified about petitioner's own statements, they were clearly "not hearsay," and thus admissible, under Rule 801(d)(2)(A).

Although petitioner does not directly assert a violation of the Sixth Amendment Confrontation Clause, his assertion that the statements lacked "particularized guarantees of trustworthiness" suggests such a claim.  Any such claim, however, is without merit, for a number of reasons.  First, the language petitioner relies upon comes from the standard governing the admissibility of hearsay statements under the Confrontation Clause set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980).  Under that standard, a hearsay statement is admissible under the Confrontation Clause only where the declarant is not available for trial and the statement bears particularized guarantees of trustworthiness.  *See Roberts*, 448 U.S. at 66. In *Crawford v. Washington*, 541 U.S.

36 (2004), however, the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements. Under the *Crawford* rule, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. Thus, under *Crawford*, whether a statement bears particularized guarantees of trustworthiness is irrelevant; the only question is whether the out-of-court statement being introduced is testimonial (in which case it is inadmissible without a chance to cross-examine the maker of the statement), or non-testimonial (in which case the statement is admissible with no further showing of trustworthiness required). *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006). There can be no doubt that statements of a party opponent, made to friends or family, do not constitute testimonial hearsay. *See United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2007).

Plaintiff apparently views Gee and Thornberry as the declarants, thus arguing that it was their testimony that required particularized guarantees of trustworthiness. This is not so. The "declarant" is the person who makes the out of court statement, *see* MICH. R. EVID. 801(b), (c), not the person who testifies in court as to the statement. Even under the *Roberts* test, it was the hearsay statement itself, not the person testifying to that statement, for which particularized guarantees of trustworthiness were required to be shown. The reliability of the person testifying to the hearsay

32

statement is subject to challenge on cross-examination. *See United States v. Shukri*, 207 F.3d 412, 417-18 (7th Cir. 2000); *see also Dutton v. Evans*, 400 U.S. 74, 88 (1970) ("From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard.").

Finally, there can be no Confrontation Clause violation arising from anything that Gee and Thornberry said at trial, because they were present at trial and subject to cross-examination. "[W]here the declarant is not absent, but is present to testify and to submit to cross examination, our cases, if anything, support the conclusion that the admission of his out of court statements does not create a confrontation clause problem." *California v. Green*, 399 U.S. 149, 162 (1970). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Prosecutorial Misconduct (Claims VIII, IX-X, XIII)*

Petitioner next raises several claims that the prosecutor committed misconduct. In Claim VIII, he argues that the prosecutor abused her charging discretion. In Claims IX and X, petitioner argues that he was denied a fair trial by various improper comments of the prosecutor. Finally, in Claim XIII he contends that the prosecutor presented perjured testimony. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Abuse of Charging Discretion (Claim VIII)*

Petitioner contends that the prosecutor abused her charging discretion by charging him with CSC-III based on his use of "force or coercion," MICH. COMP. LAWS § 750.520d(1)(b), rather than based on his sexual penetration of a person 13-16 years of age, MICH. COMP. LAWS § 750.520(d)(1)(a). Petitioner argues that because, under the CSC-III statute, consent is not a defense

33

where the victim is a minor, and because the statute provides a specific provision for sexual penetrations involving minors, the prosecutor's decision to charge him under the "force or coercion" prong was contrary to the legislature's intent and was a jurisdictional defect. The trial court twice rejected this argument, concluding that the charge was proper as a matter of state law. *See* Trial Ct. op. I, at 6-7; Trial Ct. op. II, at 5-6. This determination was consistent with state law. *See, e.g.*, *People v. Ngem*, No. 215672, 2001 WL 1324683, at *2 (Mich. Ct. App. Oct. 26, 2001) (per curiam) ("The prosecution did not charge defendants with criminal sexual conduct based on the age of the victims, all minors. Instead, the prosecutor chose to charge defendants with first-degree criminal sexual conduct, alleging the minors were forced or coerced . . . ."); *People v. Jones*, No. 205534, 1999 WL 33455086, at *1 (Mich. Ct. App. Jan. 19, 1999) (per curiam) (noting that petitioner was charged alternatively with CSC based on both force/coercion and age of the victim, and because the prosecution presented sufficient evidence to establish the force or coercion element the court did not need to consider whether sufficient evidence was presented regarding the victim's age). As noted above in connection with petitioner's evidentiary claims, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *See Estelle*, 502 U.S. at 67-68. And "[t]he scope of [a] state criminal statute . . . is purely a state law issue." *Oliver v. McNeil*, No. 4:07cv280, 2008 WL 4724806, at *15 (N.D. Fla. Oct. 23, 2008).

And this determination of state law precludes petitioner's claim that the prosecutor abused her charging discretion. A prosecutor has broad discretion in deciding what charges to pursue, and the prosecutor's charging decisions are generally not subject to review by the courts. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . generally rests entirely

in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Because, as a matter of state law, petitioner could be charged under the force/coercion or the age prongs of the CSC statute (or, indeed, under both prongs in the alternative), he cannot show that the prosecutor abused her charging discretion. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner also argues that the prosecutor improperly charged him as an habitual offender because there was no evidence to support that charge. As explained more fully below, *see infra* part H.1.b, there was evidence to support petitioner's sentencing as an habitual offender. In any event, as also explained below, under Michigan law habitual offender status is merely an enhancement imposed upon conviction for some other offense; it does not constitute a separate criminal offense that must be charged in an information or indictment.

Finally, petitioner contends that the prosecutor breached a charge bargain made at the preliminary examination. Petitioner contends that he and the prosecutor entered into an agreement whereby petitioner would waive a preliminary examination in exchange for the prosecutor reducing the first degree criminal sexual conduct charge (which had originally been filed) to third degree criminal sexual conduct. Petitioner further contends that this agreement was based on the CSC-III charge being asserted specifically under the age prong, rather than the force or coercion prong, of the CSC statute. This claim is without merit, for several reasons. First, it is not clear that there was any kind of enforceable agreement in the first instance. At the time scheduled for the preliminary examination, the prosecutor explained her reasons for amending the charges from CSC-I to CSC-III, and then stated that "under the amended complaint, I believe the Defendant would tender a waiver of preliminary examination at this time." Prelim. Exam. Tr., at 3. This language could suggest that

35

the parties had agreed to a waiver of the preliminary examination in exchange for a reduction in the charges.  It could equally suggest, however, merely the prosecutor's understanding that in light of the reduction of the charges, petitioner simply did not wish to have a preliminary examination.  No one at the preliminary examination explicitly noted the existence of an agreement between the parties.  Second, even assuming that there was an agreement, nothing in the record suggests that the agreement required the prosecutor to do anything more than reduce the charges from CSC-I to CSC-III, which the prosecutor did.  The prosecutor explained that the reason for amending the charges was that it appeared that the victim may have been 13 years old or older at the time of the assaults, rendering a CSC-I charge inappropriate.  At no point, however, did either the prosecutor or defense counsel indicate that petitioner would only be charged under the age prong of the CSC-III statute.  *See id*. at 3-4.  The record at most supports a finding that the prosecutor was obligated to reduce the charge to CSC-III, but no more.  And, consistent with this obligation, the prosecutor in fact reduced the charge.[5]

Third, petitioner cannot show that a breach of the supposed agreement violated his constitutional rights.  In *Santobello v. New York*, 404 U.S. 257 (1971), the Supreme Court held that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."  *Id*. at

---

[5]This conclusion is buttressed by the various informations filed by the prosecutor in petitioner's case, each of which is attached to the prosecutor's response to petitioner's first motion for relief from judgment, filed in this Court at docket #19-2.  The first information, filed on February 9, 2006, charged petitioner with two counts CSC-III, both alleging that petitioner "engaged in sexual penetration" with the victim "using force or coercion."  The information also cited to § 750.520d(1)(b), the force or coercion prong of the statute, with respect to each count.  The subsequent amended informations likewise each charged CSC based on "sexual penetration" "using force or coercion."  Thus, from the beginning of the case the prosecutor was proceeding on a force or coercion, and not an age, theory, and nothing suggests that the prosecutor agreed to radically alter her theory of prosecution.

262. The Court has subsequently clarified this language, holding that *Santobello* does not apply to every rescinded government promise. Rather, it applies only to those promises that induce a defendant to plead guilty. *See Mabry v. Johnson*, 467 U.S. 504, 507-08, 510 (1984). As the Seventh Circuit has explained, "[t]he *Santobello* Court did not hold that the government must fulfill every agreement or offer it makes. Rather, as we have consistently recognized, the Court was concerned with enforcing governmental promises that had induced the defendant to plead guilty." *United States v. Traynoff*,

53 F.3d 168, 170-71 (7th Cir. 1995). Here, the prosecutor's alleged agreement did not induce petitioner to plead guilty, and thus *Santobello* is inapplicable. It may be possible for a defendant to establish a due process violation on the basis of governmental promises upon which he prejudicially relies or gives up any other constitutional rights he may have had. *Cf. Traynoff*, 53 F.3d at 171 (assuming that a court "must also hold the government to its agreements that reasonably cause criminal defendants to take other damaging actions."); *United States v. Streebing*, 987 F.2d 368, 373 (6th Cir. 1993) (breach of agent's cooperation agreement which promised dismissal of charges did not warrant relief where defendant did not detrimentally rely on the promise). The Supreme Court has never so held, however, and thus there is no clearly established federal law on this point under § 2254(d)(1). And, in any event, petitioner cannot show detrimental reliance. Petitioner had no constitutional right to a preliminary examination, *see Gerstein v. Pugh*, 420 U.S. 103, 125 n.26 (1975); *Harris v. Neil*, 437 F.2d 63, 64 (6th Cir. 1971), so the prosecutor's alleged promise did not cause him to forfeit a constitutional right. Nor can petitioner establish any prejudice by the waiver of the preliminary examination. "[T]here was ample evidence of petitioner's guilt presented at trial, and all of this evidence was available to the prosecution at the time the preliminary examination was

waived.  There is thus not a reasonable probability that the district court would have found a lack of probable cause following a preliminary examination."  *Goss v. Burt*, No. 2:09-CV-14485, 2012 WL 6214361, at *7 (Nov. 9, 2012) (Komives, M.J.), *magistrate judge's report adopted*, 2012 WL 6212848 (E.D. Mich. Dec. 13, 2012) (Cleland, J.).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

    2.    *Improper Comments (Claims IX-X)*

        Petitioner next contends that he was denied a fair trial by several improper comments made by the prosecutor.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

        *a.  Clearly Established Law*

        For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id*. (internal quotation omitted).  *Darden* constitutes "[t]he 'clearly established Federal law' relevant" to a prosecutorial misconduct claim.  *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  "[T]he *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case-determinations.'"  *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In reviewing whether a prosecutor has deprived a defendant of a fair trial, a court may not consider the prosecutor's conduct in isolation, but must judge the conduct in the context of the entire

proceedings. *See Brown v. Payton*, 544 U.S. 133, 144 (2005); *United States v. Young*, 470 U.S. 1, 11 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 636, 645 (1974). Even on direct review, where AEDPA deference does not apply, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Young*, 470 U.S. at 11.

*b. Analysis*

Petitioner claims that the prosecutor committed misconduct by improperly appealing to the sympathy of the jurors by asking them to place themselves in the victim's position. During closing argument, the prosecutor stated:

> You are all sitting here as an adult, and it is very easy to forget the way you thought or the thought process of when you are five years old, six years old, seven, eight, all the way until you are a teenager. I mean you come into this courtroom with a lot of life experience and a lot more education and a lot more knowledge than a child who is at home with parents divorced, her father dying, not having really a father figure in her home, a mother who had to work full-time to provide for the family. Who probably, looking back now, regrets even meeting this Defendant and bringing him into the home, but these things happen. They may not have happened to you, but they do happen to people.
> So as hard as it is right now sitting as an adult in this jury box, try to think about yourself as a child, try to put yourself in [the victim's] position, and when you question about why wouldn't she come forward, she was a child. He played the father role. He played the dad. He introduced her as his daughter. He went to school conferences, school plays. He participated in other types of school events. He was in the home when mom wasn't in the home trying to make a living. She – he provided her with love and security. Very confusing to a child of that age who doesn't know any better, but that is what he represented to her.

Trial Tr., dated 9/5/06, at 187-88. The trial court rejected petitioner's claim, reasoning that "the prosecution was not appealing to the jury to sympathize with the victim, but was reminding the jury that the victim was a young child and that in order to determine if her reactions were believable the jurors had to remember how a child, not an adult, would react." Trial Ct. op. I, at 7. This determination was reasonable. As the trial court explained, the prosecutor did not ask the jurors to

39

place themselves in the victim's place in order to garner sympathy for the victim; rather, the context makes clear that the prosecutor was merely asking the jury to place themselves in the victim's place in order to assess her credibility based on defense counsel's cross-examination of the victim with regard to her failure to come forward with her allegations sooner. The comments were thus a fair comment on the evidence, and a fair response to defense counsel's denigration of the victim. *See Darden*, 477 U.S. at 182. Further, even if the prosecutor's references to the victim were improper, they were much less prejudicial than other comments referring to victims which have been upheld on habeas review. *See, e.g.*, *Brechen v. Reynolds*, 41 F.3d 1343, 1355-56 (10th Cir. 1994); *United States ex. rel. Rockman v. DeRobertis*, 717 F. Supp. 553, 569-70 (N.D. Ill. 1989)(prosecutor's reference to victim "in his grave crying out for a guilty verdict" did not deprive petitioner of a fair trial); *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 896-96 (E.D. Ky. 1988)(petitioner was not denied a fair trial where, during the guilt-innocence phase of the trial, the prosecutor admonished the jury not to forget the victim because "he had a right to live."), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1999) (en banc). "Indeed, *Darden* itself held that a closing argument considerably more inflammatory than the one at issue here did not warrant habeas relief." *Parker*, 132 S. Ct. at 2155 (citing *Darden*, 477 U.S. at 180, nn. 11 & 12 (prosecutor referring to defendant as an "animal" and stating "I wish I could see [the defendant] with no face, blown away by a shotgun.")).

Petitioner next contends that the prosecutor improperly vouched for the credibility of the victim. Petitioner points to three comments made during closing argument:

- "What does [the victim] have to gain now by coming forward? She is going to be that influenced by her mother's love still with the Defendant, come into a courtroom under oath and lie about something like this and carry it on for that long? She can afford at one point because she knew it was safe, he was out of the house, she probably couldn't carry this burden any longer, and she knew that he did it to somebody else. And that's when she felt comfortable finally and told her mother."

Trial Tr., dated 9/5/06, at 190.

- [speaking first of petitioner's admissions to the victim's mother] "'Did you penetrate her?' 'I don't remember.' Doesn't remember. It's too sick to admit. It's too sick that you are going to penetrate somebody's child so he perhaps just left that out, minimized it. But there is no reason that [the victim] would come in here and tell you things that happened when it didn't in fact happen the way she indicated." *Id.* at 194.

- "Is there any special reason to lie? Brianna has no special reason to lie. She finally lifted a burden that she had been carrying around by herself for many, many years when she knew that this had happened to someone else. She finally had that strength to come forward. And she has no reason to lie to you today about it. Why would this child, why would a 16 year old, tough stage of life as it is, much less five year old, why would she come forward and talk before all of these strangers and talk about something so personal and embarrassing if it really hadn't happened to her? She doesn't have a reason to lie, ladies and gentlemen." *Id.* at 203.

The trial court found that these comments were not improper, reasoning: "Considered in context, the prosecutor was not implying that she had some special knowledge, she merely argued that the victim . . . had no reason to lie – i.e, fabricate the charges against Defendant. Her arguments were responsive to defense counsel's questioning of the witnesses, and were based on evidence presented at trial." Trial Ct. op. I, at 9. This determination was reasonable.

Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[6] Here, the prosecutor did neither. During closing argument, the prosecutor extensively explained to the

---

[6]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering." *See Francis*, 170 F.3d at 551.

jurors the tools they should use in evaluating the credibility of the witnesses, and discussed in detail the testimony of the witnesses, and the reasons why the jury should consider the victim to be credible. Responding to defense counsel's attack on the victim's credibility based on her failure to come forward sooner, the prosecutor explained that the testimony showed that the victim cared for petitioner and tried to protect him, and that there was no evidence that the victim had any motive to lie. In each instance, the prosecutor did not express a personal belief in the victim's credibility or allude to any facts that were not before the jury. Rather, the prosecutor merely argued that the evidence itself, and fair inferences from the evidence and common experience, showed that the victim was credible. The prosecutor's comments were merely a fair characterization of the evidence presented to the jury based on her summation of that evidence. As such, they did not constitute impermissible vouching for the credibility of the witnesses or the guilt of petitioner. *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence).

In short, the Michigan Court of Appeals thoroughly analyzed each of petitioner's prosecutorial misconduct claims, applying the appropriate due process test under *Darden*. For the reasons set forth above, the Michigan Court of Appeals's application of that test was reasonable. "[B]ecause the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations,' [this Court] ha[s] no warrant to set aside the [Michigan Court of Appeals's] conclusion." *Parker*, 132 S. Ct. at 2155 (citation omitted) (quoting *Yarborough*, 541 U.S. at 664). Accordingly, the Court should conclude that petitioner is not entitled to habeas

relief on his prosecutorial misconduct claims.

3.    *Perjured Testimony (Claim XIII)*

Finally, petitioner contends that the prosecutor committed misconduct by presenting perjured testimony at trial. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a.  Clearly Established Law

It is well established that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *accord Napue v. Illinois*, 360 U.S. 264, 271 (1959). This is true whether the false testimony goes to the defendant's guilt or to a witness's credibility, *see Napue*, 360 U.S. at 270, and it matters not whether the prosecution directly elicits the false testimony or merely allows false testimony to go uncorrected, *see id.* at 269. To succeed on this claim petitioner must show that: (1) the prosecutor presented evidence which was false; (2) the prosecutor knew of the falsity; and (3) the evidence was material. *See Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).

With respect to the first element, petitioner bears the burden of proving that the testimony amounted to perjury. As the Fourth Circuit has explained, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987); *accord United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("[N]ot every testimonial inconsistency that goes uncorrected by the government establishes a constitutional violation."); *Horton v. United*

43

*States*, 983 F. Supp. 650, 657 (E.D. Va. 1997); *United States v. Hearst*, 424 F. Supp. 307, 318 (N.D. Cal. 1976).  (6th Cir. 1999).  As the *Verser* court further explained, to establish a constitutional violation petitioner must show that the "inconsistent testimony amounted to perjury, 'the willful assertion under oath of a false, material fact.'" *Verser*, 916 F.2d at 1271 (quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)); *see also*, *Horton*, 983 F. Supp. at 657 (quoting *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995)) (in order to establish *Napue* violation defendant must show that the government knowingly used perjured testimony, perjury being "false testimony concerning a material matter, 'given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory.'").  In other words, petitioner must show that the testimony was "indisputably false." *Byrd v. Collins*, 209 F.3d 486, 817-18 (6th Cir. 2000).

With respect to the second element, as the Sixth Circuit has explained in order for a witness's perjury at trial to constitute a basis for habeas relief, the petitioner must show "prosecutorial involvement in the perjury." *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975).  The Sixth Circuit has repeatedly reaffirmed the requirement that a petitioner show prosecutorial involvement in or knowledge of the perjury.  *See, e.g.*, *Rosencrantz v. Lafler*, 568 F.3d 583-84 (6th Cir. 2009); *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000); *King v. Trippett*, 192 F.3d 517, 522 (6th Cir. 1999); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998); *Ford v. United States*, No. 94-3469, 1994 WL 521119, at *2 (6th Cir. Sept. 23, 1994); *Akbar v. Jago*, No. 84-3540, 1985 WL 13195, at *1 (6th Cir. Apr. 10, 1985); *Roddy v. Black*, 516 F.2d 1380, 1383 (6th Cir. 1975).  And the Supreme Court has repeatedly characterized the Due Process Clause only as barring conviction on the basis of perjury known by the prosecution to be such.  *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (emphasis added) ("[I]t is established that a conviction obtained through use of false evidence,

44

*known to be such by representatives of the State*, must fall under the Fourteenth Amendment.");
*United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added) (due process is violated by the
"*knowing* use of perjured testimony."); *see id*. at 103-04 & nn. 8-9 (discussing cases).  At a
minimum, "[t]he Supreme Court has never held that due process is offended by a conviction resting
on perjured testimony where the prosecution did not know of the testimony's falsity at trial."
*LaMothe v. Cademartori*, No. C 04-3395, 2005 WL 3095884, at *5 (N.D. Cal. Nov. 11, 2005)
(citing *Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of certiorari)
(noting that the Supreme Court has yet to consider the question of whether due process is violated
by a conviction based on perjured testimony regardless of the prosecutor's knowledge)); *cf. Briscoe
v. LaHue*, 460 U.S. 325, 326 n. 1 (1983) ("The Court has held that the prosecutor's knowing use of
perjured testimony violates due process, but has not held that the false testimony of a police officer
in itself violates constitutional rights.").

### b.  Analysis

Petitioner contends that Detective Palombo committed perjury when he failed to testify that
he took a statement from Jourdin Rodriguez.[7]  During direct examination, the prosecutor questioned
Detective Palombo regarding the steps taken in his investigation, including his interviews of various
witnesses.  The prosecutor did not ask Palombo whether he had interviewed Rodriguez.  Petitioner
argues that because he had interviewed Rodriguez, Palombo's failure to mention that he did so
constituted perjury.  The trial court rejected this claim, explaining that a review of Palombo's
testimony showed that "Detective Palombo never testified regarding the limits of whom he

---

[7]Throughout the record, Rodriguez's first name is spelled alternatively as "Jordan," "Jourdin,"
and "Jourdan."  Because the "Jourdin" spelling is the one used in Rodriguez's handwritten statement
to the police, I use that spelling unless directly quoting a passage containing a different spelling.

interviewed," and that "Detective Palombo did not deny he interviewed Jourdan Rodriguez; he was never specifically asked if he did." Trial Ct. op. I, at 15. This determination was reasonable. The prosecutor took Detective Palombo through the steps of his investigation, asking about his interviews with specific people. *See* Trial Tr., dated 9/5/06, at 142-44. Detective Palombo was never asked, by either the prosecutor or defense counsel, whether he had interviewed Rodriguez, nor was he ever asked to provide an exhaustive list of all the people he interviewed. Indeed, at one point defense counsel objected to the prosecutor's line of questioning on relevance grounds, arguing that "[w]e are not here to determine how his investigation is proceeding and everything he did from A to Z." *Id*. at 143-44. Thus, petitioner has failed to show that Detective Palombo made any false statement of fact. Further, nothing in the record establishes that Detective Palombo interviewed Rodriguez. Petitioner presents Rodriguez's handwritten statement, *see* Pet'r's Reply, Appx. 11-A, but that statement does not indicate who took the statement from Rodriguez. Moreover, petitioner cannot show how, even if Palombo's testimony was false, it was material. As the trial court observed, the record shows that Rodriguez's statement was given to defense counsel in discovery, *see* Trial Ct. op. I, at 15, and there is no indication that the prosecution withheld from petitioner the identity or Rodriguez or the content of her statement to the police. Counsel had the ability to investigate Rodriguez and present any evidence of a discrepancy between her version of events and the victim's version. Thus, Palombo's failure at trial to name Rodriguez as someone he had interviewed was not material.

Petitioner also contends that Palombo testified falsely when he testified that he never interviewed the victim because it would be against his protocol to interview a minor. *See* Trial Tr., dated 9/5/06, at 141-42. Petitioner contends that this testimony was false because Palombo in fact

interviewed Rodriguez and Elizabeth Thompson, both minors.  Even if this is so (as noted above, it is not clear that Palombo rather than another officer interviewed Rodriguez), it establishes at most only that Palombo violated his own protocol.  It does nothing to establish that Palombo in fact interviewed the victim, and petitioner has pointed to absolutely nothing in the record to show that Palombo in fact interviewed the victim.

Petitioner also contends that the victim committed perjury because she changed the location of the 2003 offense.  In her original statement to the police, petitioner contends, the victim stated that the act occurred in her home, however she testified at trial that the act occurred at the home of petitioner's mother.  The trial court rejected this claim, finding that "there is nothing in the record to support the conclusion or inference that [the victim] perjured herself. . . .  That [the victim] may have remembered something differently in 2006 than she did in 2003 does not mean that she lied; she may simply have been mistaken."  Trial Ct. op. I, at 16.  This determination was reasonable. Petitioner has offered nothing to show that the victim's trial testimony, as opposed to other statements she may have made, was "indisputably false" and thus amounted to perjury. Inconsistencies between the victim's trial testimony and her prior statements does not by itself establish that she committed perjury at petitioner's trial.  Further, petitioner has not shown that the prosecutor knew of any allegedly false testimony.  Speculative allegations of prosecutorial knowledge are insufficient to establish a *Napue/Giglio* claim.  *See Skains v. California*, 386 Fed. Appx. 620, 621-22 (9th Cir. 2010).  Because petitioner has failed to establish that the victim's testimony was "indisputably false," *Byrd*, 209 F.3d at 817-18, or that the prosecutor knew of any such falsity, the Michigan Court of Appeals's rejection of petitioner's claim was reasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

47

G.    *Sufficiency of the Evidence and Right to Present a Defense (Claim XVII)*

In his seventeenth claim, petitioner contends that because the victim could not identify the specific dates of any of the sexual assaults, the prosecution presented insufficient evidence to prove his guilt beyond a reasonable doubt.  He also argues that this deprived him of his right to present a defense.  The Court should conclude that petitioner is not entitled to habeas relief on these claim.

1.    *Notice*

The trial court rejected petitioner's claim that he had insufficient notice of the charge to prepare a defense.  *See* Trial Ct. op. II, at 7.  This determination was reasonable.  The Sixth Amendment provides, in relevant part, that a criminal defendant has the right to "be informed of the nature and cause of the accusation" against him.  U.S. CONST. amend VI.  Notice and an opportunity to defend against the charges as guaranteed by the Sixth Amendment are an integral part of the due process protected by the Fourteenth Amendment, and are accordingly applicable in state prosecutions.  *See Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *In re Oliver*, 333 U.S. 257, 273 (1948).  The complaint or indictment challenged need not be perfect under state law so long as it adequately informs the petitioner of the crime in sufficient detail so as to enable him to prepare a defense.  Thus, "[a]n indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986); *see also*, *United States v. Buckley*, 689 F.2d 893, 899 (9th Cir. 1982); *Ransom v. Davis*, 613 F. Supp. 430, 431 (M.D. Tenn. 1984), *aff'd*, 767 F.2d 921 (6th Cir. 1985).  "[A] charge is sufficiently specific when it contains the elements of the crime, permits the accused to plead and prepare a defense, and allows the disposition to be used as a bar in a subsequent prosecution."  *Fawcett v. Bablitch*, 962 F.2d 617, 618 (7th Cir. 1992).

48

In cases involving a continual pattern of sexual abuse of a minor, it is often difficult to pinpoint precise dates on which the assaults occurred. Further, the time of the offense is not a necessary element, and a defendant, being familiar with the circumstances of his contact with the victim, may adequately prepare an alibi or other defense to charges based on events alleged to have occurred within a range of months or even years. The reasonableness of the trial court's determination is demonstrated by the universal rejection of claims such as petitioner's in similar circumstances. *See, e.g.*, *Fawcett*, 962 F.2d at 618-19; *Morton v. State*, 581 So. 2d 562, 565 (Ala. Ct. Crim. App. 1991); *Covington v. State*, 703 P.2d 436, 439 (Alaska Ct. App. 1985); *Bonds v. State*, 751 S.W.2d 339, 341-42 (Ark. 1988); *State v. Verdugo*, 510 P.2d 37, 38 (Ariz. 1973); *State v. Spigarolo*, 556 A.2d 112, 126-27 (Conn. 1989), *denial of habeas corpus aff'd sub nom. Spigarolo v. Meachum*, 934 F.2d 19 (2d Cir. 1991); *Roberts v. United States*, 752 A.2d 583, 589-90 (D.C. 2000); *Pagan v. State*, 599 So. 2d 744, 745-46 (Fla. Ct. App. 1992); *Eberhardt v. State*, 359 S.E.2d 908, 909 (Ga. 1987); *State v. Taylor*, 797 P.2d 158, 160-61 (Idaho Ct. Ap. 1990); *Merry v. State*, 335 N.E.2d 249, 256 (Ind. Ct. App. 1975); *State v. Dixon*, 628 So. 2d 1295, 1299 (La. Ct. App. 1993); *State v. Gifford*, 595 A.2d 1049, 1051-52 (Me. 1991); *Commonwealth v. Bishop*, 617 N.E.2d 990, 1000 (Mass. 1993); *State v. Mulkey*, 560 A.2d 24, 30 (Md. 1989); *Koerschner v. State*, 13 P.3d 451, 456 (Nev. 2000); *State v. Lakin*, 517 A.2d 846, 847 (N.H. 1986); *People v. Watt*, 644 N.E.2d 1373, 1375 (N.Y. 1994); *State v. Smith*, 599 N.W.2d 344, 350-51 (S.D. 1999); *Yeager v. Commonwealth*, 433 S.E.2d 248, 250 (Va. Ct. App. 1993).

Further, it is well established that "[a] court may ignore independent and unnecessary allegations in an indictment. Allegations in the indictment that are not necessary to establish a violation of a statute are surplusage and may be disregarded if the remaining allegations are

sufficient to charge a crime." *United States v. McIntosh*, 23 F.3d 1454, 1457 (8th Cir. 1994). "[L]anguage that describes elements beyond what is required under statute is surplusage and need not be proved at trial." *Bargas v. Burns*, 179 F.3d 1207, 1216 n.6 (9th Cir. 1999); *see also*, *United States v. Cross*, 113 F. Supp. 2d 1253, 1255 (S.D. Ind. 2000). Because the date was not an element of the offense, the prosecution did not have to prove the date of the offense beyond a reasonable doubt. Nor did this language unfairly mislead petitioner. The language did not set a date certain, but only that the offense occurred within a certain time frame. Accordingly, the trial court's rejection of this claim was reasonable, and petitioner is not entitled to habeas relief.

2.    *Sufficiency of the Evidence*

Nor can petitioner establish that the failure to establish exact dates for the offenses rendered the evidence insufficient to prove his guilt beyond a reasonable doubt. The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Petitioner does not, however, argue that the evidence was insufficient to prove beyond a reasonable doubt any element of the offense, because the time of the offense was not an element. Under Michigan law, it is well established that time is not an element of a CSC offense that must be proven beyond a reasonable doubt. *See People v. Chancellor*, No. 310121, 2013 WL 5663236, at *1 (Mich. Ct. App. Oct. 17, 2013) (per curiam); *People v. Dobek*, 274 Mich. App. 58, 82-83, 732 N.W.2d 546, 564 (2007).        While a challenge to the sufficiency of the

50

evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16). Because time was not an element of the offense under Michigan law, the prosecution's failure to prove the time of the offenses beyond a reasonable doubt does not render the evidence insufficient to sustain petitioner's convictions. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Sentencing (Claims VI, XII)*

Petitioner next raises two challenges to his sentencing as an habitual offender. In Claim VI, he contends that he was sentenced on the basis of materially false information, because he did not in fact have a prior conviction. In Claim XII, he argues that his plea to being an habitual offender was involuntary. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Inaccurate Information (Claim VI)*

a.  *Clearly Established Law*

In *Townsend v. Burke*, 334 U.S. 736 (1948), and *United States v. Tucker*, 404 U.S. 443 (1972), "the United States Supreme Court invalidated defendants' sentences because they were

51

imposed by trial courts in reliance upon material false assumptions of fact." *Eutzy v. Dugger*, 746 F. Supp. 1492, 1504 (N.D. Fla. 1989) (discussing *Townsend* and *Tucker*); *accord Stewart v. Peters*, 878 F. Supp. 1139, 1144 (N.D. Ill. 1995) (same). *See generally*, *Tucker*, 404 U.S. at 448-49; *Townsend*, 334 U.S. at 740-41. It is well established, however, that a *Tucker* violation arises only where the improper information "actually served as the basis for the sentence." *United States v. Jones*, 40 Fed. Appx. 15, 17 (6th Cir. 2002) (internal quotation omitted); *see also*, *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003); *United States v. Johnson*, 767 F.2d 1259, 1276 (8th Cir. 1985). "A sentencing court demonstrates reliance on misinformation when the court gives 'explicit attention' to it, 'found[s]' its sentence 'at least in part' on it, or gives 'specific consideration' to the information before imposing sentence." *Lechner*, 341 F.3d at 639 (quoting *Tucker*, 404 U.S. at 444, 447). Thus, to be entitled to habeas relief on this claim petitioner "must show that the sentencing court actually relied on this information and that it was materially false." *Hanks v. Jackson*, 123 F. Supp. 2d 1061, 1074 (E.D. Mich. 2000) (Gadola, J.).

### b. Analysis

Petitioner's sentence was enhanced under the Michigan habitual offender statute, which in relevant part provides for an enhanced sentence upon conviction of an offense "[i]f a person has been convicted of a felony or an attempt to commit a felony, whether the conviction occurred in this state or would have been for a felony or attempt to commit a felony in this state if obtained in this state, and that person commits a subsequent felony within this state . . . ." MICH. COMP. LAWS § 769.10(1). At sentencing, petitioner admitted that he had a cocaine related conviction in Florida in 1988. *See* Sentence Tr., at 4. The trial court rejected petitioner's claim, reasoning that petitioner could "not rely on his own testimony to contradict his prior sworn statements," and that he had

52

"presented nothing to support his contention that he was not previously convicted of a felony in 1988." Trial Ct. op. I, at 14. This determination was reasonable. It is petitioner's burden to demonstrate that the conviction upon which the trial court relied in enhancing his sentence did not exist or was invalid. *See Richardson v. Berghuis*, No. 2:12-CV-13405, 2010 WL 3290961, at *11 (E.D. Mich. Aug. 16, 2010) (Tarnow, J.). Petitioner has failed to carry that burden here. In support of his claim, petitioner contends that the adjudication in the 1988 Florida case was withheld. *See* Pet'r's Reply, at 34. The document upon which he relies, however, does not support this claim. That document shows that petitioner pleaded guilty to both the sale and possession of cocaine. The "adjudication of guilt and imposition of sentence" were "withheld" pending a two year period of probation. *See id*., Appx. 6-B. However, petitioner has cited, and I have found, no Michigan cases suggesting that such a disposition does not constitute a "conviction" for purposes of the habitual offender statute. And this Court has no warrant to upset the trial court's determination that the Florida disposition constituted a conviction under state law. "The determination by a state of what constitutes a prior felony conviction under its Multiple Offender Act presents no federal question." *United States ex rel. Nersesian v. Fay*, 239 F. Supp. 142, 143 (S.D.N.Y. 1965); *see also*, *Layton v. South Dakota*, 918 F.2d 739, 742 (8th Cir. 1990); *Jones v. Painter*, 140 F. Supp. 2d 677, 679 (N.D. W. Va.), *aff'd*, 20 Fed. Appx. 187 (4th Cir. 2001).

In any event, petitioner cannot show that the habitual offender enhancement was material to his sentence. At petitioner's resentencing, the trial court explicitly stated that even if petitioner's prior conviction did not subject him to an habitual offender enhancement, the court would depart from the guidelines and impose the same sentence. *See* Resentencing Tr., at 21-22. In rejecting petitioner's claim on postconviction review, the trial court incorporated this finding, "reiterat[ing]

that 13½ to 22½ years is an appropriate sentence even if the Court of Appeals was to set aside the habitual second conviction as this Court would deviate up to that sentence under the circumstances of this case." Trial Ct. op. I, at 14. Because the court would have imposed the same sentence even without the habitual offender enhancement, any misinformation regarding the prior conviction was not material to petitioner's sentence. *See Moore v. Howes*, No. 07-11844, 2009 WL 55922, at *7 (E.D. Mich. Jan. 8, 2009) (Zatkoff, J., adopting report of Komives, M.J.); *cf. Tucker*, 404 U.S. at 448 ("[T]he real question here is . . . whether the sentence . . . might have been different if the sentencing court [had not relied on erroneous information]."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Validity of Plea (Claim XII)*

Petitioner next claims that his plea to being an habitual offender was invalid. This argument fails, for two reasons. First, although Michigan law was at one time different, as it now stands (and as it stood at the time of petitioner's conviction) "[t]he habitual-offender statutes provide enhancement of a defendant's sentence on the basis of prior felony convictions. They do not create a substantive offense independent of the principal charge." *People v. Brown*, 492 Mich. 684, 689, 822 N.W.2d 208, 211 (2012). Thus, there need not be a finding of guilt or entry of a plea on the habitual offender status before imposing an habitual offender sentence; habitual offender status is a matter for the court to determine at sentencing. *See* MICH. COMP. LAWS § 769.13(5); *Wilson v. Davis*, No. 06-14285, 2008 WL 3853293, at *4-*5 (E.D. Mich. Aug. 8, 2008) (Duggan, J., adopting report of Komives, M.J.). Even assuming there was some defect in the plea proceeding that the trial court conducted, this would not entitle petitioner to habeas relief, as such a plea was not a necessary predicate to the imposition of an habitual offender sentence.

54

In any event, petitioner cannot show that his "plea" was involuntary. A plea of guilty is valid if it is entered voluntarily and intelligently, as determined under the totality of the circumstances. *See Brady v. United States*, 397 U.S. 742, 748-49 (1970); *King v. Dutton*, 17 F.3d 151, 153 (6th Cir. 1994). The Constitution requires, for a plea to be valid, that the defendant be informed of all direct consequences of his plea. *See Brady*, 397 U.S. at 755; *King*, 17 F.3d at 153. A solemn declaration of guilt by the defendant carries a presumption of truthfulness. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *Henderson v. Morgan*, 426 U.S. 637, 648 (1976). "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge*, 431 U.S. at 74. Where the defendant "was fully aware of the likely consequences when he pleaded guilty[,] it is not unfair to expect him to live with those consequences[.]" *Mabry v. Johnson*, 467 U.S. 504, 511 (1984). Here, the trial court informed petitioner of the nature of the habitual offender charge and the sentence he could receive upon his plea. *See* Sentence Tr., at 3-4. Petitioner contends that his plea was invalid because he did not in fact have a qualifying conviction, but as explained above petitioner has failed to show that the Michigan courts would not consider the Florida disposition to be a conviction under the habitual offender statute. Petitioner also contends that he was under stress at the time, but this does not render his plea invalid. "'[D]istress' and 'nervousness' are the characteristics of most persons facing immediate trial under a criminal prosecution. To accept such a normal emotional reaction as a ground to vitiate a plea entered only after extensive questioning of a defendant to assure its constitutional validity, would make a shambles of the guilty plea procedure." *Fluitt v. Superintendent, Green Haven Correctional Facility*, 480 F. Supp. 81, 86 (S.D.N.Y. 1979). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.      *Ineffective Assistance of Counsel (Claims II, V, VII, XI, XIV, XVI, XVIII)*

Finally, petitioner raises numerous claims of ineffective assistance of counsel. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id*. With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would

56

have had a reasonable doubt respecting guilt." *Id.* at 695. It is petitioner's burden to establish the

elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818,

833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v.*

*Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is

difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review

a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

With respect to appellate counsel, it is well established that "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Although it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Id*. As a general rule, it is "'only when ignored issues are clearly stronger than those presented [that] the presumption of effective assistance of counsel [can] be overcome.'" *Id*. (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Further, in the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See id*. at 285-86; *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).

## 2. *Interlocutory Appeal (Claim II)*

Petitioner first claims that his trial counsel was ineffective for failing to file a separate brief in connection with the prosecutor's interlocutory appeal of the trial court's initial decision excluding the other acts evidence. The Michigan Court of Appeals rejected this claim. After first explaining why the other acts evidence was admissible under state law, *see Bennett*, 2008 WL 942009, at *1-*3, the court of appeals concluded that petitioner could establish neither deficient performance nor prejudice. The court explained that although counsel did not file a separate brief, he did "submit[] a copy of his trial court response to the prosecutor's evidentiary motion in lieu of filing an answer to the prosecutor's application for leave to appeal." *Id*. at *3. Further, the court explained, "[e]ven if trial counsel should have presented a specific argument concerning MCL 768.27a in response to the prosecutor's application for leave to appeal, because defendant has failed to establish any

reasonable probability that application of this statute would have resulted in the exclusion of the other acts evidence, defendant's claim of ineffective assistance of counsel cannot succeed." *Id.* at *4. This determination was reasonable.

After fully considering petitioner's arguments on direct appeal, the Michigan Court of Appeals determined that the other acts evidence was properly admitted under state law. In analyzing petitioner's ineffective assistance of counsel claim, this expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). And in light of this determination, petitioner cannot show a reasonable probability that the evidence would have been excluded had counsel filed a further brief in response to the prosecutor's interlocutory appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.    *Impeachment/Cross Examination (Claims V & XI(E))*

Petitioner next contends that counsel was ineffective for failing to properly impeach and cross-examine several witnesses. In Claim V, petitioner contends that counsel failed to properly impeach KS, the witness who provided the other acts evidence. In Claim XI(E), he contends that counsel was ineffective for failing to cross-examine Mildred Hewlett. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

"[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) (Friedman, J.); *see Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001); *Dows v. Wood*, 211

F.3d 480, 489 (9th Cir. 2000). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Dell*, 194 F. Supp. 2d at 1219; *accord Millender v. Adams*, 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002) (Rosen, J.). The mere fact that other avenues of impeachment may have existed does not render counsel ineffective; counsel need not "develop every bit of testimony through all available inconsistent statements." *Poyner v. Iowa*, 990 F.2d 435, 438 (8th Cir. 1993); *see also*, *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (internal quotation omitted) (counsel not ineffective even though "other testimony might have been elicited from those who testified."); *United States v. Kozinski*, 16 F.3d 795, 817 (7th Cir. 1994) (counsel not ineffective where counsel could have elicited additional impeachment information on cross-examination).

With respect to KS, petitioner contends that counsel should have impeached her testimony that she had not met the victim, BB, prior to the day of trial. *See* Trial Tr., dated 9/5/06, at 162. In support of this claim, petitioner points to Detective Palombo's report of his interview with KS and her mother, which indicates that KS had in fact met BB prior to trial. *See* Pet'r's Reply, Appx. 5-A. It is not clear that this would have actually been impeaching. The victim's first name was Brianna. At trial, KS testified that she met petitioner through her friend, Brianne Huffman, and saw him when visiting Brianne Huffman's house. *See* Trial Tr., dated 9/5/06, at 155, 156-57. It is possible that Detective Palombo simply confused Brianne Huffman with the Brianna who was the victim in the case. In any event, counsel did cross-examine KS, eliciting from her that her younger sister was friends with the victim, and that she had been to the victim's home in the summer of 1999. *See* Trial Tr., dated 9/5/06, at 163. In light of the great deference given to counsel's judgment in matters of cross-examination and impeachment, petitioner has failed to show that counsel was deficient or that

he was prejudiced by counsel's performance, much less that the trial court's conclusion that he had failed to do so was unreasonable as required by § 2254(d)(1).

Petitioner also contends that counsel should have impeached KS with a phone call she supposedly made to petitioner in which she admitted to fabricating the past incident and apologized. In support of this claim, petitioner presents the affidavits of Catherine and Amanda Pleak, who both claim to have overheard this conversation. *See* Pet'r's Reply, Appx. 5-B, 5-C. However, counsel challenged KS's testimony regarding the alleged 2002 incident at the Salas's house through the testimony of Arturo Salas. Salas testified that KS and petitioner came over to his house around Memorial Day 2003, not in 2002 as testified to by KS. *See* Trial Tr., dated 9/5/06, at 173. He also testified that he did not see anything happen between petitioner and KS and, contrary to KS's testimony, he did not hear KS call out for help at any time. *See id.* at 173-74. Counsel made a reasonable strategic decision to challenge KS's testimony in this manner, and petitioner cannot show that counsel was ineffective for pursuing this avenue rather than further cross-examining KS. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner also contends that counsel was ineffective for failing to cross-examine Mildred Hewlett, his mother. Counsel called Hewlett as a witness, and she testified that she was at her home all the time and petitioner was never there with BB alone, without BB's mother also being present. *See* Trial Tr., dated 9/5/06, at 166-67. She also testified on redirect examination that petitioner did not have a key to her house, and had no access to the house unless she was home. *See id.* at 172. Counsel had no reason to cross-examine Hewlett, because she was petitioner's witness. Petitioner contends, based on an affidavit from his mother, *see* Pet'r's Reply, Appx. 11-P, that counsel should have questioned Hewlett regarding an incident at the courthouse prior to the preliminary

61

examination.  She claims that at this time Detective Palombo "aggressively" questioned the victim. Even assuming that this incident occurred, there is no indication that counsel was ever informed about it.  Moreover, counsel could have reasonably concluded that the testimony of the victim's mother on this point would have done little to help petitioner's case, given her obvious interest in helping petitioner.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 4.  *Failure to Investigate and Present Witnesses (Claims XI(A)-(D))*

Petitioner next contends that counsel was ineffective for failing to investigate and present various witnesses.  Specifically, petitioner contends that counsel should have called: Jourdin Rodriguez, the victim's friend; Catherine Pleak, his girlfriend at the time of trial; Amanda Pleak, Catherine's daughter; and Linda Hornsby.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.  Counsel's strategic decisions regarding what witnesses to call at trial are "virtually unchallengeable."  *Awkal v. Mitchell*, 613 F.3d 629, 641 (6th Cir. 2010).  The Court's "concern is not to decide, using hindsight, what [it] think[s] would have been the *best* approach at trial.  Instead, [the Court] consider[s] only if the approach ultimately taken was within 'the wide range of reasonable professional assistance' given the circumstances."  *English v. Romanowski*, 602 F.3d 714, 728 (6th Cir. 2010) (quoting *Strickland*, 466 U.S. at 689).  Petitioner has failed to show that counsel's performance was deficient, or that he was prejudiced.

With respect to Rodriguez, petitioner cannot show that counsel was ineffective.  Petitioner contends that differences between her statement to the police, *see* Pet'r's Reply, Appx. 11-A, and the victim's testimony would have helped him show that the victim was fabricating one of the (uncharged) incidents of sexual assault.  However, Rodriguez states in her statement that she fell

asleep on the couch, *see id.*, consistent with the victim's testimony that Rodriguez had passed out

on the couch. *See* Trial Tr., dated 9/5/06, at 39. Thus, there was no inconsistency in this testimony.

Further, because Rodriguez was asleep or passed-out, she could not have witnessed anything and

therefore could not have shed light on whether petitioner did or did not sexually assault the victim.

Finally, in her statement Rodriguez indicates that the victim told Rodriguez that she was afraid to

be alone with petitioner. Counsel could have reasonably concluded that Rodriguez would have

provided favorable testimony to the prosecution, and declined to call her on this basis.

 With respect to the Pleaks, Catherine Pleak was in fact called as a witness by the prosecution.

Contrary to other prosecution witnesses, she testified that petitioner did not admit to Gee and

Thornberry that he sexually assaulted the victim. *See* Trial Tr., dated 9/5/06, at 126. She also

testified that she was then petitioner's girlfriend and was living with him. Counsel could have

reasonably concluded not to press the matter further, given Pleak's interest in helping petitioner.

With respect to both Pleaks, petitioner contends that counsel should have questioned them regarding

the alleged phone call in which KS apologized for fabricating her story of being sexually assaulted

by petitioner. This testimony, however, would not have been admissible. Under the rules of

evidence, hearsay is not admissible. *See* MICH. R. EVID. 802. Hearsay is defined as "a statement,

other than the one made by the declarant while testifying at the trial or hearing, offered in evidence

to prove the truth of the matter asserted." MICH. R. EVID. 801(c). Because the Pleaks' testimony

regarding KS's statement on the telephone would have been offered to proof the truth of the matter

asserted–*i.e.*, that she was not in fact sexually assaulted by petitioner–it was inadmissible hearsay.[8]

---

[8]The rule provides that a statement is not hearsay if the declarant testifies at trial and the statement is inconsistent with the declarant's testimony, but only if the statement "was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." MICH. R. EVID. 801(d)(1)(A). KS's statements in the telephone call obviously were not given under oath.

Even if counsel had laid a proper foundation to introduce this evidence to impeach KS's testimony, *see* MICH. R. EVID. 613(b), this would have impeached a witness on a collateral matter; it would not have affected the jury's assessment of the victim's credibility. And KS, in light of her testimony, likely would have vehemently denied making any such statement. In light of the evidence against petitioner, there is not a reasonable probability of a different result had counsel sought to introduce this testimony. Petitioner's claim that counsel should have called Linda Hornsby to testify regarding the alleged incident in which Detective Palombo aggressively questioned the victim fails for the same reason as does his claim that counsel should have questioned Hewlett on this matter.

### 5.   *Failure to Challenge Jurors (Claim XIV)*

Petitioner next contends that counsel was ineffective for failing to challenge two jurors for cause. Juror Brown indicated in a note to the court that she had a distant cousin, with whom she had no contact for over 40 years, who was in prison for a child sexual assault. The note indicated that she was not close to this cousin "at all." Juror Bloomer provided a note to the court in which he indicated that he had a second cousin who was "attached to the Prosecutor's Office as an attorney" but that this would "not in any way influence my jury service in this case." Trial Tr., dated 9/5/06, at 3. Upon receiving these notes, the trial court asked the attorneys whether they wished to ask further questions of these jurors. Both the prosecutor and defense counsel declined to inquire further. *See id.* Petitioner contends that counsel should have sought to excuse these jurors for cause. The trial court rejected this claim, concluding that petitioner had failed to show that either of these jurors was actually biased against him. *See* Trial Ct. op. I, at 12-13. This determination was reasonable.

"[J]ury selection is a process that inherently falls within the expertise and experience of trial

counsel." *Palacio v. State*, 511 S.E.2d 62, 67 (S.C. 1999) (citing cases).  Because of this, counsel's decisions in the jury selection process are the type of strategic decisions which are particularly difficult to attack.  *See Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989); *Cordova v. Johnson*, 993 F. Supp. 473, 530 (W.D. Tex.) (footnote omitted) (internal quotation omitted) ("Selecting a jury is more art than science. There is nothing unreasonable or professionally deficient in a defense counsel's informed decision to rely upon his own reading of venire members' verbal answers, body language, and overall demeanor[.]"), *aff'd*, 157 F.3d 380 (5th Cir. 1998).  Here, petitioner has failed to offer anything to show that counsel's decision to these jurors was anything other than a reasonable strategic decision.

More importantly, even if petitioner could show that counsel's performance was deficient, he cannot show that he was prejudiced by counsel's failure to seek removal of these jurors.  In order to establish prejudice attributable to a counsel's failure to remove a juror, a defendant must show that the juror was actually biased. *See Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001); *Hughes v. United States,* 258 F. 3d 453, 458 (6th Cir. 2001); *Irons v. Lockhart*, 741 F.2d 207, 208 (8th Cir. 1984); *Parker v. Turpin*, 60 F. Supp. 2d 1332, 1362 (N.D. Ga. 1999); *Odle v. Calderon*, 919 F. Supp. 1367, 1389 (N.D. Cal. 1996).  Here, petitioner has failed to show that these jurors were actually biased.  With respect to Juror Brown, the mere fact that a distant relative had been convicted of a crime a number of years earlier does not give rise to a presumption of bias.  *See Jones v. Cooper*, 311 F.3d 306, 312-13 (4th Cir. 2002); *United States v. Ross*, 263 F.3d 844, 847 (8th Cir. 2001).  Likewise, with respect to Juror Bloomer, the fact that he had a cousin who worked in the prosecutor's office does not give rise to a presumption of bias.  "Courts will not presume bias simply because a juror works in law enforcement, is related to someone working in law enforcement or is

acquainted with law enforcement personnel." *King v. Hedgpeth*, No. CIV S-08-1524, 2010 WL 2698609, at *21 (E.D. Cal. July 07, 2010) (citing *United States v. Le Pera*, 443 F.2d 810, 812 (9th Cir.1971); *United States v. Caldwell*, 543 F.2d 1333, 1347 (D.C.Cir.1974); *Mikus v. United States*, 433 F.2d 719, 723-24 (2d Cir.1970)); *see also*, *United States v. West*, 458 F.3d 1, 8-9 (D.C. Cir. 2006); *United States v. Graves*, 418 F.3d 739, 743 (7th Cir.2005); *Paradis v. Arave*, 954 F.2d 1483, 1491 (9th Cir. 1992) (habeas relief not warranted based on counsel's failure to challenge juror who attended church at which prosecuting attorney was a bishop), *vacated in part on other grounds*, 507 U.S. 1026 (1993). Further, both jurors indicated during *voir dire* that they could be fair and impartial, and Juror Bloomer explicitly stated as much in his note. The court must presume that these assurances were truthful. *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (question in case of juror bias is whether juror swore "that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."); *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987) (habeas relief not warranted on petitioner's claim of juror bias where juror stated he could be impartial despite his relationship with the victim). Because petitioner has not shown that these jurors were actually biased, and because there is no basis upon which to presume bias, petitioner cannot show that he was prejudiced by counsel's failure to remove these jurors. *See Southward v. Warren*, No. 2:08-CV-10398, 2009 WL 6040728, at *27-*28 (July 24, 2009) (Komives, M.J.) (trial counsel not ineffective for failing to seek removal of juror for cause who revealed after jury selection but prior to oral arguments that she had been the victim of a sexual assault many years prior to the trial, where there was no showing that the juror was actually biased), *magistrate's report adopted*, 2010 WL 233035 (E.D. Mich. Feb. 26, 2010) (Steeh, J.). It follows that the trial court's rejection of petitioner's claim was reasonable, and petitioner

therefore is not entitled to habeas relief on this claim.

6.      *Failure to Challenge Time Frame (Claim XVIII)*

Petitioner next contends that counsel was ineffective for not challenging either the sufficiency of the evidence or his notice of the charges based on the large time frame in which the assaults were alleged to have occurred.  As explained above, *see supra* part G, time was not an element of the offense, and the information provided sufficient notice of the charges against petitioner.  Thus, any objection on these bases would have been futile.  Counsel cannot be deemed ineffective for failing to raise a meritless objection.  *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993).

7.      *Appellate Counsel (Claims VII, XVI)*

Finally, petitioner contends that appellate counsel was ineffective for failing to raise on direct appeal the claims that he raised in his state postconviction motions.  As noted above, to show that counsel's performance was deficient, petitioner must show that the issues counsel ignored were clearly stronger than those that counsel raised, and to demonstrate prejudice petitioner must show a reasonable probability that the claims would have succeeded on appeal.  Because, as explained throughout this Report, each of petitioner's claims is without merit, petitioner cannot make these showings.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his appellate counsel claims.

J.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides

67

that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073 (citing 28 U.S.C. § 2253(c)(3)).

Where, as here, a petition is dismissed on a procedural basis, the inquiry under § 2253(c) is two-fold. In such a case, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the

68

denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 485 (emphasis added). As the Court explained, "[w]here a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id*. at 486.

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability. First, the conclusion that the bulk of petitioner's claims are barred by his procedural default is not reasonably debatable. It is beyond dispute that the claims raised in petitioner's state postconviction motions

were rejected on the basis of Rules 6.508(D)(3) and 6.502(G), and that these rules constitute adequate and independent procedural grounds barring petitioner's claims. It is also beyond dispute that petitioner did not adequately exhaust the claims that he failed to raise in both the Michigan Court of Appeals and the Michigan Supreme Court on direct appeal, and that this failure amounts to a procedural default. Further, it is not reasonably debatable that, with respect to the claims not raised in the Michigan Supreme Court on direct appeal or raised for the first time in his second motion for relief from judgment, petitioner cannot rely on ineffective assistance of counsel as cause to excuse his default, because he did not have a right to counsel on discretionary appeal or in his first motion for relief from judgment. With respect to the claims raised for the first time in petitioner's first motion for relief from judgment, petitioner cannot show cause because appellate counsel was not ineffective for failing to raise those claims on direct appeal.

Likewise, the resolution of petitioner's claims on the merits is not reasonably debatable, for the reasons explained above. Petitioner's evidence claims, as well as his claim that the prosecutor abused her charging discretion, clearly present noncognizable claims for relief. Petitioner has failed to show that any of the prosecutor's comments were improper or that the prosecution presented any perjured testimony, and thus the resolution of these claims is not reasonably debatable. Further, it is clear that the time of the offense was not an element that was required to be proven beyond a reasonable doubt, and thus the resolution of petitioner's sufficiency of the evidence claim is not reasonably debatable. Likewise, in light of the numerous cases finding indictments with large time frames sufficient to provide notice, the resolution of petitioner's notice claim is not reasonably debatable. Because petitioner has failed to show that the Michigan courts would find that the disposition of his Florida case was not a conviction for purposes of the habitual offender statute, and

70

because in any event the trial court indicated that it would impose the same sentence even in the absence of the conviction, the resolution of petitioner's sentencing claim is not reasonably debatable. Finally, the resolution of petitioner's ineffective assistance claims is not reasonably debatable, for the reasons explained in the preceding section. Accordingly, the Court should deny petitioner a certificate of appealability.

K.    *Conclusion*

In view of the foregoing, the Court should conclude that the bulk of petitioner's claims are barred by his procedural default in the state courts. The Court should also conclude with respect to each claim raised by petitioner that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local*

*231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Date: March 11, 2014                          s/Paul J. Komives_____
                                              PAUL J. KOMIVES
                                              UNITED STATES MAGISTRATE JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 11, 2014.

                                              s/ Kay Doaks_____
                                              Case Manager